*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NANCY PARKER,

　　　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

GENERAL EXTRUSIONS, INC.,

　　　　　　　　　*Defendant-Appellee.*

No. 06-3353

---

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 05-00120—James Gwin, District Judge.

Argued: March 9, 2007

Decided and Filed: June 26, 2007

Before: DAUGHTREY and ROGERS, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Martin S. Hume, MARTIN S. HUME CO., L.P.A., Youngstown, Ohio, for Appellant. Richard C. Haber, HABER POLK LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Martin S. Hume, MARTIN S. HUME CO., L.P.A., Youngstown, Ohio, for Appellant. Richard C. Haber, HABER POLK LLP, Cleveland, Ohio, for Appellee.

---

## OPINION

---

　　　　MARTHA CRAIG DAUGHTREY, Circuit Judge. The plaintiff, Nancy Parker, appeals the district court's order granting judgment as a matter of law under Rule 50(b) to the defendant, General Extrusions, Inc., on the plaintiff's claim for punitive damages in relation to her Title VII gender discrimination suit, which she brought pursuant to 42 U.S.C. §§ 2000e-2000e-17. The jury found for the plaintiff on her hostile working environment claim and, along with compensatory damages, awarded Parker punitive damages. On motion of the defendant, however, the district court struck down the punitive damages award, holding that punitive damages were not available pursuant to 42 U.S.C. § 1981a(b)(1) because (1) only one of the employees who discriminated against Parker was a "managerial agent" of the defendant, (2) this single employee did not act with the requisite malice or reckless indifference to justify punitive damages, and (3) in any event, the defendant had

---

[*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

made a good faith effort to comply with Title VII, thereby insulating itself from punitive damages liability. The plaintiff appeals this ruling on all three grounds. For the reasons stated below, we reverse.

## *FACTUAL AND PROCEDURAL BACKGROUND*

From August 2000 until February 2004, Parker was employed by General Extrusions as a shop worker on the night shift in the defendant's fabrication department, which was responsible for creating aluminum parts by extruding, cutting to size or punching such products out of metal. The fabrication department was predominately male, with an average of five females employed in a department of approximately 20 people. According to witnesses, a "loose" atmosphere pervaded the night shift in the fabrication department: there was a "tremendous amount of horseplay"; the workers as well as the management spoke freely in "shop talk" or "locker room talk," meaning they used profanity including crude and vulgar terms; and the male employees made sexual comments about and to female employees.

The plaintiff established that while working within this environment, she was subjected to pervasive sexual harassment from several co-workers. Although she reported a number of these incidents of sexual harassment to her immediate supervisors, including foremen Rob Greenway, John Alexander and Steve Kopkash, and, on occasion, to the human resources manager, Terry Maloney, the record demonstrates that her complaints were not adequately addressed.

For example, one of Parker's co-workers, Justin O'Hara, called Parker a "fucking whore" and made vulgar comments about her sexual activities, implying that she was promiscuous. The plaintiff reported this incident to her supervisor, foreman Steve Kopkash, who replied that the comment "could be considered a compliment." He did not report the incident to the Human Resources manager, Terry Maloney, in violation of the company's sexual harassment policy.

The most severe and pervasive harassment came from another co-worker, Eric Rendes, who repeatedly referred to Parker in derogatory terms such as "whore," "bitch," "slut," and "crybaby." These comments were at times made even in the presence of the foremen on duty, but Rendes was not disciplined. On one occasion Rendes typed "fuck you" on Parker's output card, and he repeatedly used vulgar language to tell the plaintiff, or tell others while the plaintiff was in earshot, about the sexual acts that he was going to perform on his girlfriend after work. On at least one occasion Rendes made unsolicited comments to Parker regarding sexual acts Parker should perform in order to "keep" her husband. When the plaintiff asked Rendes to stop this behavior, he told her that he liked to harass women and that he had been fired from a previous job for harassing women.

Parker complained verbally to at least one foreman about Rendes's behavior, specifically about his vulgar language. Rendes was subsequently called into the foreman's office, told that Parker was complaining about his language, and informed that Parker was going to be reassigned so that she no longer worked with him. Rendes did not, however, receive any discipline for his actions, and none of the foremen reported the incident to the human resources manager, Terry Maloney, again in violation of the company's sexual harassment policy. In fact, Rendes testified that the foremen generally "hushed it up" and tried to "keep it in house" when these kinds of complaints were brought to their attention.

Even after she was reassigned, Parker continued to have problems with Rendes. He played "tricks" on her, such as hiding her work equipment. At one point, Rendes purposefully blew metal saw chips in her direction and, on another occasion, threw large pieces of metal that she had to dodge in order to avoid being hit. One of the foremen, John Alexander, observed the saw-chips incident but did not discipline Rendes for it. Instead, he laughed and walked away.

The plaintiff testified that because she had not received an adequate response following her complaints to the foremen in her department, she went to Terry Maloney to discuss the situation. According to the plaintiff, she started to describe Rendes's reprehensible behavior toward her and indicated what Rendes had told her about being fired from a previous job for harassing women. Maloney allegedly cut her off, saying, "That's hearsay and I don't want to hear it." As a result, Parker felt that Maloney had taken Rendes's side without hearing her out. She became upset, began crying, and asked for a shift change. It is unclear from the record before this court whether her request was honored.

At a later point, the plaintiff again had cause to complain about Rendes, who had used the intercom system to make heavy breathing sounds obviously intended to be sexual in nature. The plaintiff felt that this behavior was directed at her, and she made a written complaint about it to Terry Maloney. As a result of this incident, Rendes was called into a meeting with Terry Maloney, foremen Steve Kopkash and Rob Greenway, and a union representative. He was told that Parker had accused him of sexual harassment and he replied that he "would rather jack off than touch her." Maloney reportedly "chuckled" at this comment, did not express disapproval of it, and then began discussing what action to take in response to the intercom incident. The discussion led to Rendes being given a verbal warning for "horseplay," but he was not disciplined for sexual harassment. When Rendes later testified about this meeting, he expressed his view that the company wanted to get rid of both him and Parker: him because of his sexual harassment, and her because she complained about things, including sexual harassment. He also testified that there was some speculation during the meeting that Parker was complaining in an effort to extort money from the company.

Parker testified that the result of this meeting was "humiliating" for her, explaining that although she was led to believe that Maloney would keep her complaint as confidential as possible, he loudly told her about the result of the meeting in a public work area where all her co-workers could hear it. Moreover, soon after this incident, Parker was assigned to work on a deburring machine, a job which was considered less desirable than most other jobs in the fabrication department.

At this point, Parker also ran into trouble with another co-worker, Eli Rodriguez, who teased her by unplugging a fan she was using. When Parker asked him to plug the fan back in, he screamed various derogatory terms at her, calling her, for example, a "mother-fucking bitch." Parker reported this incident to foreman Kopkash and, because she was upset, apparently left work early. Kopkash sent an e-mail to Terry Maloney indicating that Rodriguez and Parker had gotten into "a fight," that he thought Parker was just looking for a reason to go home early, and that he would make sure she was disciplined for absenteeism. Rodriguez was not disciplined for the incident, even though he admitted using the language at issue (he asserted that Parker used similar language, which she denied). Meanwhile, Parker took sick leave necessitated by the stress created by the on-going harassment. During this time, Maloney's assistant attempted to contact Parker regarding the fan incident, but the assistant was rude and demanding in the messages she left, and Parker did not reply because she did not feel mentally and emotionally able to do so.

By July 2003, Parker had contacted an attorney, who wrote a letter to the chairman of the board of General Extrusions, Herb Schuler Sr., outlining the harassment recounted above, as well as a number of other incidents. In response to the letter, a meeting was held in which Parker, her attorney, board chairman Schuler, and the company attorney were present. At the meeting Schuler agreed that Parker could report any further sexual harassment to him. After the meeting, Terry Maloney was instructed to and did investigate a number of the allegations made in the letter, although the company attorney instructed him to forgo at least one claim (that a co-worker had put a frozen water bottle between Parker's legs). According to the defendant, other allegations were not investigated because specific names were not given or because the individual named was no longer

employed at General Extrusions. Finally, the allegations concerning Maloney's failure to take Parker's complaints seriously were never investigated, apparently because no one other than Maloney was assigned to oversee the investigation.

The final incident of harassment occurred sometime after this meeting and after the plaintiff returned from sick leave. While working on a machine that had a slow oil leak, Parker asked a co-worker, Bob Montwori, to help her hang a cup on the machine to catch the oil. Montwori's response to the request was something to the effect of "You want me to hang it on my cock?" A few days after this incident, Parker presented to the foreman on duty, Russell Green, a written complaint detailing what had happened and asked him to sign it. Harvey Toy, a union representative, went with Parker to present her written complaint to Green. Green told Parker that he did not know how to deal with a sexual harassment claim, and Green, Parker and Toy went to find Maloney in his office, but he had already left for the day. At some point later that night, Maloney became aware of the complaint through another co-worker, phoned in to the office, and spoke with Green, Montwori and Toy. Although Montwori denied making the comment, Toy told Maloney that Montwori had already admitted to him privately that he had made the comment. Maloney instructed Green to sign the complaint and said that he would return the next day, a Saturday, to investigate further.

Parker reported to work next day, but as the day proceeded Maloney did not show up. Eventually Green phoned Maloney to ask whether he was coming in, and Maloney told Green that he had car trouble and could not make it in that day. Maloney later testified that he did not actually have car trouble but, upon reflection, thought it best to discuss the situation with the company attorney before proceeding further and therefore decided to wait until Monday to take any action. When Parker learned that Maloney was not coming in to investigate she became distraught, ended up going on sick leave again, and finally decided to quit when her sick leave was over.

Harvey Toy, the union representative who had helped Parker with the Montwori complaint, testified on Parker's behalf at trial that at various times he had assisted Parker in putting forward other complaints of sexual harassment at work. He also testified that at some point he spoke with Maloney about Parker's complaints and that Maloney had said, "This is a mill-type environment. If she doesn't like it here, she can go get a job somewhere else." Toy added that at least one foreman had expressed a similar sentiment. He said that most of the time those to whom Parker reported the harassment "thought it was a joke." He also testified that his foreman (whom he did not specifically name) had told him to "be careful" in what he said and did in relation to his testimony in Parker's case and threatened to fire him as the result of any cooperation with the plaintiff's litigation.

That litigation produced a jury verdict in the plaintiff's favor, awarding $25,000 in compensatory damages and $75,000 in punitive damages. Based on the defendant's motion filed pursuant to Federal Rule of Civil Procedure 50(b), the district court set aside the latter award, holding: first, that the "Plaintiff's allegations are insufficient to warrant an award of punitive damages . . . [because] none of the employees who harassed Parker was a managerial agent"; second, that the only managerial agent involved, Mahoney, may not have engaged in a "fully effective" investigation of Parker's complaints of harassment but that "he took harassment complaints seriously" and "did not exhibit . . . malice or reckless indifference to the Plaintiff's rights"; and, finally, that the company "made a good faith effort to comply with Title VII."

## DISCUSSION

Without regard to the accuracy of the district court's call on the first ground for overturning punitive damages, we think the legal analysis on the second and third bases is simply not supported by the evidence, as reflected in the jury's verdict. It is for this reason that we have found it

necessary to set out the facts at some length, although the summary in this opinion does nothing more than provide an idea of the abuse to which Parker was subjected on the job – many of the more salacious allegations have been omitted from our narrative.  It is sufficient to note that the harassment was sufficiently continuous and serious enough to force Parker to take two separate medical leaves of absence and, significantly, that it was still going on at the time she finally left the company for good, despite what the district court described as the defendant's "good faith effort to comply with Title VII."  We conclude that this sorry state of affairs must be laid at the feet of Terry Maloney, who was – without question – a managerial agent of General Extrusions.

In reaching this conclusion, we recognize that we review *de novo* the district court's grant of a Rule 50(b) motion for judgement as a matter of law.  "In a federal question case, the standard of review for a Rule 50 motion based on sufficiency of the evidence is identical to that used by the district court.  The evidence should not be weighed, and the credibility of the witnesses should not be questioned.  The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences."  *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005).  The Rule 50(b) motion should be granted only if "reasonable minds could not come to a conclusion other than one favoring the movant."  *Id.*

A Title VII claimant is entitled to recover punitive damages only when she can demonstrate by a preponderance of the evidence that the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).  In *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), the Court laid out a three-part inquiry into determining whether punitive damages are proper under this standard.  First, the plaintiff must show that the individuals perpetrating the discrimination acted with malice or reckless disregard as to whether the plaintiff's federally protected rights were being violated.  *Kolstad*, 527 U.S. at 536.  To meet this standard, those individuals must "at least discriminate in the face of a perceived risk that its actions will violate federal law."  *Id.*

Second, in order to impute liability to the employer, common law rules of agency apply.  Most relevant to the present case, the principal-employer is liable, only if "the agent was employed in a managerial capacity and was acting in the scope of employment . . . ."  *Id.* at 542-43 (citing Restatement (Second) of Agency § 217C (1957)).  "[N]o good definition of what constitutes a 'managerial capacity' has been found . . . and determining whether an employee meets this description requires a fact-intensive inquiry."  *Id.* at 543 (internal quotation marks and citation omitted).  "In making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished."  *Id.* (internal quotation marks and citation omitted).  "[A]n employee must be important, but perhaps need not be the employer's top management, officers, or directors to be acting in a managerial capacity."  *Id.* (internal quotations and citation omitted).  That employee acts within the scope of employment if "the conduct is the kind the employee is employed to perform," it "occurs substantially within the authorized time and space limits" of his employment, and it is "actuated, in least in part, by a purpose to serve the employer."  *Id.* at 543-44 (citing Restatement (Second) of Agency, § 228(1), at 504) (internal quotations and alterations omitted).

Last, even if the plaintiff is successful in proving the first two inquiries, the defendant can nonetheless avoid liability for punitive damages if it can show that it engaged in good faith efforts to comply with Title VII.  *See id.* at 544-46.  This modification of the common law agency rules is necessary in order to support and reward employers who are instituting one of the main goals of Title VII: prevention of work-place discrimination.  *See id.* at 545. With this in mind, courts interpreting this criteria since *Kolstad* have focused both on whether the defendant employer had a written sexual

harassment policy and whether the employer effectively publicized and enforced its policy.[1]  *See*, *e.g.*, *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858-59 & n.7 (7th Cir. 2001) (collecting cases).

We agree with the district court's determination that Terry Maloney satisfies the *Kolstad* "managerial agent" standard and, on appeal, the parties do not dispute this legal conclusion.  Where we part company with the district court is in its determination that Maloney's conduct does not reflect "malice or reckless disregard" for Parker's right to be free from discrimination in the workplace.  Nor do we find any basis upon which to conclude that the company made a good-faith effort to enforce its non-discrimination policy.

It is unnecessary to take issue with the district court's conclusion that Maloney bore no malice toward Parker, because a review of the record indicates quite clearly that Maloney was, at the very least, recklessly indifferent to her plight.  Significantly, after Maloney received the first complaint from the plaintiff regarding the metal throwing incident with Rendes, Maloney immediately took Rendes's side without any investigation.  When he finally did investigate, he simply spoke to Rendes and, based on Rendes's denial of any wrongdoing, took no disciplinary action whatever.

After Parker complained to Maloney again, this time about the intercom incident, Rendes was initially told that he had been accused of sexual harassment.  However, Rendes was not ultimately punished for sexual harassment, but instead was written up for the relatively minor offense of "horseplay."  Rendes testified that at the meeting about this incident, Maloney "chuckled" when Rendes made a sexually offensive comment about Parker in Maloney's presence.  Importantly, Rendes testified that after this meeting he got the impression that management was "looking for a reason to get [Parker] out" because she "complained."  When asked to clarify whether he specifically meant her complaints about sexual harassment, Rendes said that it related to Parker "trying to get me on sexual harassment."   Parker testified that Maloney told her about the result of the meeting in a public place, in front of other employees, in an effort to embarrass her.

In response to Kopkash's e-mail to Maloney regarding the fan incident with Eli Rodriguez, Maloney looked into the circumstances but did nothing to stop the foreman from punishing Parker for absenteeism.  Informed about the letter from Parker's counsel, Maloney did undertake investigation, but neither he nor higher-up management assigned the investigation to someone else, despite the fact that Maloney himself was named as part of the basis for the complaint.

Without question, oversights such as these, whether intentional or merely reckless in the extreme, could lead a jury to infer that the investigation was not taken seriously.  Finally, although Parker's departure from the company hindered Maloney's investigation into the final incident with Malwori, Maloney admitted that he had told the foreman to tell Parker that he would investigate the next day, but then did not come in the next day and, moreover, lied about his reason for doing so.  Additionally, Harvey Toy testified that in his role as Parker's advocate, he questioned Maloney about Parker's complaints, and Maloney replied, "This is a mill-type environment.  If she doesn't like it here, she can go get a job somewhere else." The overt callousness of this response could only have convinced the jury that Maloney did not take Parker's complaints seriously.

Viewing all this evidence in its totality and drawing all reasonable inferences in favor of the plaintiff, a rational fact-finder could plausibly choose to credit Rendes's testimony that the company was out to get Parker because of her continued complaints and, therefore, that any investigation into those complaints was, at best, half-hearted and, at worst, a sham.  Failure to engage in adequate

---

[1] At least one circuit, the Tenth, has adopted a direct liability theory in cases in which management level employees fail to rectify a hostile working environment and, therefore, has refused to consider any evidence of good faith efforts to comply with Title VII.  *See McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 & n.4 (10th Cir. 2006).

investigation – not once but on multiple occasions – coupled with conduct intended to embarrass and ultimately drive the plaintiff out of the company, is legally sufficient to fulfill the "malice or reckless disregard" standard. *See*, *e.g.*, *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 513-14 (6th Cir. 2001) (recklessness found where managers did not adequately respond to employee's complaints of harassment); *see also Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1269 (10th Cir. 2000) ("[R]ecklessness and malice are to be inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints despite knowledge of serious harassment.").

We likewise find no legal merit to the defendant's contention that it is insulated from liability for punitive damages based on evidence of the company's good-faith efforts to comply with Title VII. In support of this argument, the defendant points to its written policy, which was modified once during the plaintiff's tenure in order to strengthen the employees' protections; testimony from various witnesses about sexual harassment training sessions both before and after the plaintiff's case became known to company management; and what the defendant characterizes as management's "prompt[] and reasonable respon[se]" to the defendant's complaints.

Although this evidence might be somewhat persuasive if we were deciding the issue in the first instance, the defendant's argument in this regard ignores the standard to which it is now held. In the present procedural posture, the plaintiff need only point to evidence on the record from which any rational juror could find that the defendant was not making good faith efforts to comply with Title VII. The plaintiff fulfills this obligation through the testimony of Harvey Toy, Justina Wade, and Terry Maloney. Toy testified that in his ten years at the company, he did not remember receiving any sexual harassment training until the plaintiff's case became prominent, and Wade testified that although she was aware of the sexual harassment policy, in her experience it was unenforced. The jury was free to credit this testimony and conclude that the countervailing testimony regarding training sessions and enforcement was exaggerated or even false. Moreover, we have in the record Maloney's testimony that in his 21 years as the human resources manager at General Extrusions, he had never disciplined a foreman for not reporting an incident of sexual harassment. There is also testimony regarding the foremen's failure to report instances of sexual harassment against Parker in violation of the sexual harassment policy, as well as Kopkash's testimony that in his entire career at the company, he never reported an instance of sexual harassment to Maloney. Obviously, a reasonable juror could infer that the company was not making good faith efforts to ensure that its policy was actually being enforced but was, instead, turning a blind eye to sexual harassment occurring on the shop floor and simply letting the foremen handle it "in house."

In the face of this record, the defendant nevertheless cites *Bryant v. Aiken Regional Medical Centers, Inc.*, 333 F.3d 536 (4th Cir. 2003), for the proposition that "courts do not hesitate to deny punitive damages in cases, such as this one, where an employer has presented credible evidence that it acted in good faith in attempting to comply with Title VII." In *Bryant*, however, the Fourth Circuit held that the defendant had presented evidence of "widespread anti-discrimination efforts, *the existence of which appellee [did] not dispute*." 333 F.3d at 549 (emphasis added). Here, the plaintiff put on evidence disputing the extent of any sexual harassment training, as well as proof calling into question not only the credibility but the very sincerity of enforcement efforts on the defendant's part.

## CONCLUSION

For the reasons set out above, we REVERSE the judgment of the district court insofar as it sets aside the jury's award of punitive damages and REMAND for entry of an order in the district court reinstating and confirming that award.