**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WANDA M. BRYANT, individually
and as class representative on behalf
of all persons similarly situated,
　　　　　　　　*Plaintiff-Appellee,*

　　　　　　v.

AIKEN REGIONAL MEDICAL CENTERS
INCORPORATED,
　　　　　　*Defendant-Appellant.*

No. 02-2147

WANDA M. BRYANT, individually
and as class representative on behalf
of all persons similarly situated,
　　　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

AIKEN REGIONAL MEDICAL CENTERS
INCORPORATED,
　　　　　　*Defendant-Appellee.*

No. 02-2192

Appeals from the United States District Court
for the District of South Carolina, at Aiken.
Cameron M. Currie, District Judge.
(CA-00-1224-22BC)

Argued: May 8, 2003

Decided: June 27, 2003

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge King joined.

---

## COUNSEL

**ARGUED:** Richard James Morgan, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellant. David Eliot Rothstein, GERGEL, NICKLES & SOLOMON, P.A., Columbia, South Carolina, for Appellee. **ON BRIEF:** Reginald Wayne Belcher, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellant.

---

## OPINION

WILKINSON, Circuit Judge:

Plaintiff Wanda M. Bryant filed suit against defendant Aiken Regional Medical Centers, Inc. (ARMC), alleging that ARMC had denied her a promotion on several occasions both because of her race and in retaliation for her complaints about discrimination in ARMC's hiring policies. A jury found in her favor and awarded her backpay, compensatory damages for emotional distress, and punitive damages. The district court declined to overturn the jury's verdict. We affirm the jury's finding of liability and its award of backpay and compensatory damages for emotional distress, but we reverse the award of punitive damages.

### I.

Wanda Bryant, an African-American woman, was trained as a surgical technician in the United States Army Reserves. She received her diploma in that field from the Army in February 1998. After completing her medical training, she took a full-time job as a surgical technician at the Medical College of Georgia. She also worked part-time — between twenty and thirty hours a month — as a surgical technician for ARMC on an as-needed basis. She continued working part-time for ARMC until December 1990, when she was called up to active

duty in Saudi Arabia during the first Gulf War. While in Saudi Arabia, she served as a surgical technician with the 382nd Field Hospital unit.

Some time after returning from the Persian Gulf, Bryant applied for a full-time position as a surgical technician with ARMC. She was informed that there were no openings for surgical technicians, but was offered a position as a full-time central services technician. The position of central services technician offered substantially less pay and required significantly less skill than the position of surgical technician. Central service technicians are chiefly responsible for assembling trays of surgical equipment for upcoming procedures and cleaning instruments after surgery. Surgical technicians, by contrast, act as direct assistants to doctors during surgical procedures in the operating rooms. While in Saudi Arabia with her reserve unit, for example, Bryant worked as a surgical technician on surgeries involving everything from war casualties and burn victims to the delivery of newborn babies. After receiving ARMC's offer, Bryant agreed to take the lower-status position of central services technician in the hope that a surgical technician position would become available.

While employed at ARMC as a central services technician, Bryant enrolled in an associate nursing degree program at the University of South Carolina-Aiken. She later applied and was accepted in an ARMC nursing scholarship program, under which ARMC agreed to give her a thousand dollars per semester towards her university tuition. As part of this scholarship program, Bryant agreed to work for ARMC for a year and a half in exchange for every year of tuition assistance she received from ARMC. She attended school full-time while continuing to work full-time as a central services technician at ARMC. She also began to work part-time on an as-needed basis for another employer, St. Joseph's Hospital, in her preferred position of surgical technician.

There was a shortage of surgical technicians throughout ARMC in both 1997 and 1998. In October 1997, Bryant saw a job as a surgical technician posted on an ARMC employee bulletin board. Bryant applied for the job, complying with required procedures and discussing her application with her manager and the perioperative surgical coordinator. She received no response of any kind to her application.

Three months later, in January 1998, the surgical technician position was still open, and Bryant submitted a second application for the job. This time, she received a response. The hiring managers informed her that in order to become a surgical technician she first had to complete a training program. When Bryant told them that she had already been certified as a surgical technician by the Army — and that she had in fact previously worked as a surgical technician for ARMC — the managers reiterated that she would have to complete the training program at the hospital in order to become a surgical technician. Because training was only offered during hours when Bryant was unavailable because of her class schedule at nursing school, she was not offered the job.

The surgical technician position still had not been filled in April 1998. Because Bryant's school semester had ended and she was therefore available for training, she reapplied once again for the same job.

Bryant also complained, she testified, to her supervisor and to the hospital's service excellence coordinator (who was a designated point person for race discrimination complaints) that she believed she was being discriminated against in the promotion process because of her race. The service excellence coordinator told her that he would "check into it" and get back to her with a response. She never heard anything back from him. Shortly after her complaint, however, her treatment at work changed dramatically. Previously, Bryant testified, she had been recognized as a good worker and the most experienced central service technician on her shift; in fact, she had been made a de facto supervisor of inexperienced technicians. After her discussion with the service excellence coordinator, however, she testified that she suddenly became subject to constant "nitpicky" critiques from ARMC management and that the atmosphere became "hostile." And once again, Bryant was not offered the surgical technician position, which remained open until September 1998 despite the acknowledged shortage ARMC was suffering throughout that entire year.

Bryant graduated from nursing school in December 1998, at a time when ARMC was suffering from a nursing shortage that had plagued the hospital throughout 1998. In the beginning of December, Bryant applied for a series of nursing positions that had been posted at ARMC. ARMC does not dispute that she would have qualified for at

least two of these positions upon receiving her nursing license.[1] Beyond paper qualifications, Bryant also had a documentary record of strong job performance. Her immediate supervisor in the central services department wrote her an unsolicited letter of recommendation, stating that Bryant exhibited "discipline, energy and commitment," that her work ethic was "a[n] example for others on staff," that she was "almost passionate about getting the job done right," that she frequently "volunteered to cover shifts or work overtime even with short notice," and that "others on staff look[ed] to [her] for advice and guidance."

Despite this recommendation, Bryant was interviewed for only one position. When she arrived for the interview, however, she was informed that the hiring nurse was unavailable. Bryant was interviewed instead by two staff nurses. She never heard back from any nurse in that department. She repeatedly contacted ARMC's human resources department throughout the application process, to no avail. She also contacted the chief nursing executive, who "just casually dismissed" Bryant's concerns and repeatedly put Bryant off because she didn't have time to discuss the issue. The chief nursing executive ultimately told Bryant that "she didn't see what the problem was" with a licensed nurse simply continuing to work as a central services technician. And the director of human resources responded to her concerns by informing her that he did not have a signed copy of her scholarship agreement, telling her that she should not consider herself bound to work for ARMC any longer, and wishing her good luck in her future career.

Bryant finally decided that she had to seek employment as a nurse at other hospitals. She gave two weeks' notice to ARMC and resigned

---

[1]ARMC argues that Bryant had not yet received her nursing license when she submitted her job application and therefore was not eligible to be hired. Bryant testified, however, that no such policy had ever been communicated to her. More to the point, ARMC's own witness testified that ARMC would interview nurses before they had formally received their nursing licenses. That policy certainly makes sense: in a nursing shortage, a hospital has every incentive to secure employees who are on the verge of getting their nursing licenses, even if they could not begin work on the date they submit their application or are interviewed.

her position as a central services technician effective February 22, 1999. She took a nursing position at Barnwell County Hospital, a job which gave her lower pay and fewer employee benefits than the nursing positions at ARMC would have.

Bryant brought suit against ARMC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. She alleged that ARMC had repeatedly discriminated against her in the job application process both because of her race and because she had complained about racial discrimination. The case went to trial, and the jury found that ARMC had refused to promote Bryant to the surgical technician position in retaliation for her complaints about racial discrimination. The jury also found that Bryant had been denied a promotion to the registered nurse position because she was African-American. The jury found that racial discrimination was not a factor, however, in ARMC's failure to offer Bryant a surgical technician position. Bryant was awarded $40,000 in compensatory damages for lost wages and benefits, $50,000 for emotional distress, and $210,000 in punitive damages. This appeal ensued.

## II.

ARMC first argues that the district court erred in failing to grant judgment as a matter of law, or in the alternative a new trial, on Bryant's retaliation claims.

We review *de novo* the district court's ruling on ARMC's motion for judgment as a matter of law. *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Under Fed. R. Civ. P. 50(b), the question is whether a jury, viewing the evidence in the light most favorable to Bryant, "could have properly reached the conclusion reached by this jury." *Id.* at 645 (citation omitted). If reasonable minds could differ about the result in this case, we must affirm the jury's verdict. *Id.* On the denial of ARMC's motion for a new trial, we review the district court's decision under Fed. R. Civ. P. 59 for abuse of discretion. *Id.* at 650. On a motion for a new trial, the district court may weigh the evidence and should grant a new trial only if "1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice." *Id.*

A plaintiff can prove illegal retaliation under Title VII or § 1981 if he shows that "(1) he engaged in protected activity, (2) he suffered an adverse employment action at the hands of [his employer]; and (3) [the employer] took the adverse action because of the protected activity." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001). Once the plaintiff makes this case, the employer can defend itself by producing "evidence of a legitimate, non-discriminatory reason for taking the adverse employment action." *Id.* It is then up to the jury to decide whether the adverse action was actually taken for the proffered reason, or if it was intended as a retaliatory measure. When reviewing the judgment below, we examine the "full trial record to determine whether sufficient evidence supported the jury's verdict" on the ultimate question of the alleged retaliatory discrimination. *Gibson v. Old Town Trolley Tours of Washington, D.C.*, 160 F.3d 177, 181 (4th Cir. 1998).

Bryant clearly engaged in protected activity. Title VII protects the right of employees to oppose any "unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3 (2003). Employees are thus guaranteed the right to complain to their superiors about suspected violations of Title VII. *Thompson v. Potomac Elec. Power. Co.*, 312 F.3d 645, 650 (4th Cir. 2002). Bryant did exactly that. The jury heard testimony that she complained to both her immediate supervisor and the hospital's service excellence coordinator about her suspicion that she had not been promoted to surgical technician because of racial discrimination.

It is similarly beyond quarrel that Bryant suffered an adverse employment action. It has long been clear that failure to promote an employee constitutes an adverse employment action for the purposes of § 2000e-3. *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001); *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). Bryant was denied a promotion to the position of surgical technician when she applied for the third time in April 1998.

Bryant also presented evidence sufficient for a reasonable jury to find that ARMC's failure to promote her was the result of her complaints about suspected discrimination. She testified that after her complaints, her treatment at work changed dramatically. She went from being recognized as a superior employee to being faced with

constant "nitpicky" criticisms and the repeated charge that "your job is not up to par." The jury could have concluded from the evidence that this change in treatment was one manifestation of hospital management's retaliation against Bryant for her complaint. It was similarly a reasonable inference, particularly given the jury's ability to judge the credibility of several of ARMC's managerial employees, that this retaliation further manifested itself in the hospital's refusal to promote Bryant.

The reasonableness of this inference is supported by the lack of any real reason to deny Bryant the job. ARMC does not suggest that Bryant's work as a central services technician was subpar; indeed, there was substantial evidence that precisely the opposite was true. She had extensive experience as a surgical technician — including service in the Saudi Arabian trauma centers during wartime and even an extended stint at ARMC itself. Her skills were current, because she had been continuing to work part-time as a surgical technician at another hospital. And there was a conceded shortage of surgical technicians at ARMC at the time she applied. In light of all these factors, it was a reasonable inference for the jury to conclude that the service excellence coordinator (who was, after all, responsible for handling and resolving precisely such complaints) had shared Bryant's complaints with others in hospital management, and that Bryant had been denied her requested promotion because of those complaints.[2]

We therefore hold that there was sufficient evidence to support the jury's verdict on the issue of unlawful retaliation, and the district court did not abuse its discretion in refusing to grant a new trial on this score.

III.

ARMC next argues that the trial court should have granted judgment as a matter of law or a new trial on Bryant's claim that she was denied a promotion to nurse because of her race.

---

[2]Perhaps unsurprisingly, ARMC makes no effort to proffer a legitimate, non-discriminatory reason for refusing to promote Bryant to surgical technician.

Under the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Bryant must present evidence that "(1) [she] is a member of a protected group; (2) [she] applied for the position in question; (3) [she] was qualified for the position; and (4) [she] was rejected for the position under circumstances giving rise to an inference of unlawful discrimination."[3] *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998). To defend itself, ARMC must then respond by "producing a legitimate nondiscriminatory reason for its decision." *Columbia Colleton Med. Ctr.*, 290 F.3d at 646. "Once the parties satisfy [these] relatively modest obligations . . . 'the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved that the defendant intentionally discriminated against [her] because of [her] race.'" *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (internal punctuation omitted)), *abrogated on other grounds*, *Desert Palace, Inc. v. Costa*, 2003 WL 21310219 (U.S.) (evidentiary standard for mixed-motive jury instruction). We now review the jury's resolution of that final question under the standards set forth by Rule 50 and Rule 59.

Viewed in the light most favorable to Bryant, there was sufficient evidence to support her claim of racial discrimination. ARMC was suffering from the same nursing shortage that was plaguing the entire health care industry. In the context of this hiring crunch, ARMC had a commitment from Bryant that she would work for the hospital as a nurse — the scholarship program guaranteed ARMC first call on Bryant's services. And ARMC makes no argument that Bryant was a difficult or mediocre employee; indeed, there is significant evidence in the record to support the conclusion that she had an established record of excellent performance.

ARMC thus had every reason to hire Bryant. Instead, she was given the runaround for more than two months after applying for vacant nursing jobs for which she would have been fully qualified. Some of her applications were simply ignored. One ARMC manager

---

[3]In failure-to-promote cases such as this, "the framework of proof for disparate treatment claims . . . is the same for actions brought under Title VII, or § 1981, or both statutes." *Mallory v. Booth Refrig. Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989).

told her that she saw no problem with a licensed nurse being stuck in a lower-skilled job in central services. And the director of Human Resources ultimately tried to nudge her out the door by releasing her from her commitment to the hospital and wishing her the best of luck in her future career. Moreover, almost two months after her departure, some of the nursing positions she had applied for were still unfilled. With no legitimate reason proffered for this treatment of a qualified applicant for a difficult-to-fill vacancy, we cannot say that there was no reasonable basis for the jury to conclude that racial discrimination was the reason for the company's failure to hire Bryant.

On appeal, ARMC contends that Bryant did not offer evidence that she was treated differently from a similarly situated white applicant or that the hospital ever hired a less qualified white applicant for a position Bryant sought. This argument misapprehends the require-ments of Title VII: Bryant is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim. *See Columbia Colleton Med. Ctr.*, 290 F.3d at 648-49 n.4 (holding that plaintiff need not prove that she was better qualified than a successful applicant if other circumstantial evidence suggests discrimination). We would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial review because no white applicant had hap-pened to apply for a position during the time frame in question. It is true that if ARMC argued that Bryant was not as well qualified as another applicant who was actually hired, Bryant could help her case as an evidentiary matter by establishing that she was better qualified than the other applicant. But ARMC has not made that argument here. However helpful a showing of a white comparator may be to proving a discrimination claim, it is not a necessary element of such a claim.

ARMC further argues that Bryant did not give the hospital enough time to review her nursing application because she left the hospital three weeks after receiving her state nursing license. (Bryant received her state license on January 31, 1999. Her last day at ARMC was Feb-ruary 22, 1999.) Even if ARMC was genuinely unable to process her longstanding application during those three weeks, however, there was sufficient evidence in the record for the jury to conclude that ARMC would interview and hire nurses before they formally received their state nursing license. And Bryant began that job application pro-

cess at the beginning of December 1998 — almost three months before she ultimately left the hospital.

Finally, ARMC argues that it hired two other African-American applicants for nursing positions in the same general time frame as Bryant's applications. It is true that an employer can attempt to rebut charges of discrimination against an African-American applicant for a promotion by pointing to "other similarly situated African-American employees" who were promoted. *Potomac Elec. Co.*, 312 F.3d at 650. But neither employee relied upon by ARMC here was situated similarly to Bryant. One of the applicants was not hired until several months after Bryant filed charges of racial discrimination with the EEOC. The other applicant was only hired for a part-time position. Neither hiring sufficiently rebuts the inference of discrimination to the point that no reasonable jury could have found in Bryant's favor.

We therefore hold that there was sufficient evidence to support the jury's finding that ARMC unlawfully discriminated against Bryant in refusing to hire her as a nurse. We also hold that the district court did not abuse its discretion in refusing to grant a new trial on this score.

IV.

ARMC also challenges the jury's award of $50,000 in compensatory damages for emotional distress. It argues that there was insufficient evidence to support such an award, and that its motion for new trial *nisi remittitur* should therefore have been granted.

We review for abuse of discretion the district judge's denial of a motion for a new trial based on the alleged excessiveness of the jury's compensatory damage award. *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999). A new trial on damages must be granted if "[1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice." *Cline v. Wal-Mart Stores*, 144 F.3d 294, 305 (4th Cir. 1998).

In this case, the evidence presented at trial supported an award of damages for emotional distress. We have held that a plaintiff's testi-

mony, standing alone, can support an award of compensatory damages for emotional distress. *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996). Such testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* at 1254. The testimony cannot rely on "conclusory statements that the plaintiff suffered emotional distress" or the mere fact that the plaintiff was wronged. *Id.* Rather, it must indicate with specificity "how [the plaintiff's] alleged distress manifested itself." *Id.* The plaintiff must also "show a causal connection between the violation and her emotional distress." *Columbia Colleton Med. Ctr.*, 290 F.3d at 653.

Bryant was sufficiently specific about the emotional trauma she suffered as a result of ARMC's actions. She explained that she was "embarrassed, frustrated, and angry," "very disgusted," and that she "didn't feel very good about coming to work." She also testified that this distress inflicted a series of specific physical ailments on her: "frequent headaches, insomnia, irregular menstrual cycles, nausea, [and] vomiting." ARMC argues that we should discount her testimony because she did not seek medical attention for the physical symptoms she was suffering. But Bryant testified that she had always been taught to believe that "anything can be handled through prayer and faith" and to "rely on [her family] for strength." She therefore chose to address "the signs and symptoms of what stress could do to a person" through "prayer and faith" and "through talking with [her] family." That was an understandable way for Bryant to respond to the situation in which she found herself. It is also worth noting, as the district court observed, that Bryant "was herself a medical professional whose opinion as to her own condition the jury was entitled to consider."

We further reject ARMC's suggestion that the degree of Bryant's distress was unreasonable. She was working multiple jobs and trying to better herself by pursuing further education in her field. As ARMC's former director of surgical services testified, Bryant was known even outside ARMC as a capable employee. But in applying for jobs that she qualified for, she was stonewalled for almost one year. Her emotional distress was a reasonable reaction to this mystifying frustration of her professional career.

We also hold that $50,000 was not an excessive amount of compensation for Bryant's emotional distress. The cases cited by ARMC do not convince us otherwise. *Hetzel v. County of Prince William*, 89 F.3d 169 (4th Cir. 1996), rejected the far greater amount of $500,000 for a plaintiff, "[m]uch if not all" of whose claimed distress was caused by the legally irrelevant and "*erroneous* belief that she was the victim of invidious discrimination." *Id.* at 171 (emphasis added) (remanding for recalculation of damages award). Indeed, *Hetzel* specifically cited a Tenth Circuit case which held that a $50,000 jury verdict could be supported by testimony about emotional distress by a plaintiff and his wife. *Id.* at 172; *See Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989) (noting that while plaintiff's "testimony and the evidence presented are not the most graphic and detailed display of emotional and mental anguish and distress, we cannot conclude that *some* award for such anguish and distress is unsupported by substantial evidence"). And while *Cline v. Wal-Mart Stores* capped a plaintiff's damages at $10,000, there was no evidence in that case of "physical symptoms of stress, such as depression or loss of sleep." 144 F.3d at 306. Here, Bryant testified quite specifically about precisely such physical symptoms.

For these reasons, we uphold the jury award of $50,000 to Bryant in compensatory damages for emotional distress.

V.

ARMC also contends that the award of punitive damages was a miscarriage of justice and cannot be supported by the facts demonstrated at trial.

The jury's determination of the amount of punitive damages is "not a factual determination about the degree of injury but is, rather, an almost unconstrained judgment or policy choice about the severity of the penalty to be imposed, given the jury's underlying factual determinations about the defendant's conduct." *Atlas Food Sys. and Svcs. v. Crane Nat'l Vendors*, 99 F.3d 587, 594 (4th Cir. 1996). The review of a jury's award of punitive damages is accordingly reviewed "less deferentially than are factual findings." *Id.* at 595. The trial court must compare its own "independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so

excessive as to work an injustice." *Id.* The appellate court then reviews the trial judge's decision in this regard for an abuse of discretion. *Id.*

In this case, we find that the trial judge erred by approving the jury's punitive damages award. 42 U.S.C. § 1981a authorizes punitive damages for Title VII plaintiffs if they can demonstrate that an employer acted "with malice or with reckless indifference to [their] federally protected rights." 42 U.S.C. § 1981a(b)(1) (2003). This standard requires not "a showing of egregious or outrageous discrimination," but rather proof that the employer discriminated "in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 535-36 (1999). The Supreme Court has held, however, that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII."[4] *Id.* at 545 (citation and internal punctuation omitted).

In contrast to cases where employers "never adopted any anti-discrimination policy [or] provide[d] any training whatsoever on the subject of discrimination," *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 461 (4th Cir. 2002), ARMC had an extensively implemented organization-wide Equal Employment Opportunity Policy. That policy, a version of which was included in the employee handbook, stated that "all persons are entitled to equal employment opportunity regardless of race" and that "it is and shall continue to be our policy

---

[4]For an employer to be held vicariously liable for punitive damages, a plaintiff must also show that the discriminating employee served the employer in a managerial capacity and committed the intentional discrimination while acting within the scope of employment. *Lowery v. Circuit City Stores*, 206 F.3d 431, 442 (4th Cir. 2000). In this case, there was sufficient evidence for the jury to find by reasonable inference that the discrimination and retaliation against Bryant involved at least one of the following: the Director of Surgical Services, the Director of Human Resources, and the manager in charge of nurse hiring. There can be no real dispute that these employees qualified as "managerial agents" under *Kolstad*. *See id.*; *see also Restatement (Second) of Torts* § 909, Illustrations.

to provide promotion and advancement opportunities in a non-discriminatory fashion." ARMC also created a grievance policy encouraging employees to bring forward claims of harassment, discrimination, or general dissatisfaction, and employees were explicitly informed that they would not be retaliated against for making a complaint. There was also a carefully developed diversity training program that included formal training classes and group exercises for hospital employees. And ARMC voluntarily monitored departmental demographics as part of an ongoing effort to keep the employee base reflective of the pool of potential employees in the area. These widespread anti-discrimination efforts, the existence of which appellee does not dispute, preclude the award of punitive damages in this case. As the Court noted in *Kolstad*, giving protection from punitive damages to "employers who make good-faith efforts to prevent discrimination in the workplace accomplishes Title VII's objective of motivat[ing] employers to detect and deter Title VII violations." 527 U.S. at 545-46 (internal punctuation omitted).[5]

## VI.

We affirm the jury's finding of liability as well as its award of compensatory damages. We reverse the award of punitive damages and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART AND REVERSED IN PART*

---

[5]On cross-appeal, Bryant also argues that the trial court should have enhanced her award of backpay to offset the higher income tax burden she will incur because of receiving that amount in one lump sum. The trial court has "broad equitable discretion to fashion remedies to make the plaintiff whole for injuries resulting from a violation" of Title VII. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 356 (4th Cir. 1994). We review its decision to deny such equitable relief only for an abuse of discretion, *id.*, and we hold that the district court did not abuse its discretion in denying Bryant's motion.