**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0457n.06

**Nos. 08-1600 & 08-1601**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jul 27, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| FRANK KEVIN FISCHER, | ) | |
| | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| UNITED PARCEL SERVICE, Inc., | ) | |
| | ) | |
| Defendant-Appellant/Cross-Appellee. | ) | |

Before:  SUHRHEINRICH, SUTTON and COOK, Circuit Judges.

COOK, Circuit Judge.  Kevin Fischer sued his former employer, United Parcel Service, Inc. (UPS), accusing it of firing him in retaliation for (1) a previous race discrimination lawsuit he brought against the company; and (2) filing several internal complaints.  A jury returned a verdict in Fischer's favor, awarding him back pay, compensatory damages, and punitive damages.  UPS filed a post-trial motion challenging the sufficiency of the evidence, certain evidentiary rulings, and the validity of the punitive damage award.  UPS alternatively sought remittitur of the compensatory award.  The court vacated the punitive damage award but denied the other requests for relief, and UPS appealed.  Fischer cross-appealed, arguing that the district court erred by vacating the punitive damage award and by granting summary judgment in favor of UPS on his state-law retaliation claim based on his internal complaints.

I. Background

Fischer began his career with UPS in 1985 as an hourly worker and, over the years, rose through the ranks to become a National Account Manager (NAM) in 1997. As a NAM, Fischer's principal responsibility involved selling UPS products and services to large corporate accounts. Throughout his tenure as a NAM, Fischer produced excellent sales numbers.

In October 2000, Fischer, an African American, sued UPS in federal court, claiming race discrimination, retaliation, and harassment. UPS obtained summary judgment on the race discrimination and retaliation claims, and the harassment claim proceeded to trial in December 2001. Fischer's supervisor, Alison Jarlett, testified for the defense. The jury returned a verdict in UPS's favor. For much of the pendency of the suit, Fischer was on medical leave from his job. He returned to work in February 2002, approximately two months after the harassment trial ended. The instant case concerns Fischer's experiences after his return. According to Fischer, Jarlett singled him out for differential treatment beginning on his first day back on the job. Fischer claimed that the retaliatory treatment continued for more than a year, eventually culminating in his termination on February 11, 2003.

Fischer sued UPS in the United States District Court for the Eastern District of Michigan, accusing the company of violating Title VII and Michigan's Elliott-Larsen Civil Rights Act by unlawfully retaliating against him for his prior lawsuit and several internal complaints he filed just prior to his termination. The district court granted UPS's motion for summary judgment on the

portion of the claim premised on Fischer's internal complaints, but, finding genuine disputes over material facts, allowed the claim of retaliation for the prior lawsuit to go to trial. *Fischer v. United Parcel Serv.*, No. 05-70366, 2007 WL 313565 (E.D. Mich. Jan. 30, 2007). Following a seven-day trial, the jury returned a verdict in Fischer's favor, awarding him $150,000 in back pay, $650,000 in compensatory damages, and $1,300,000 in punitive damages. The court reduced the punitive damages award to reflect Title VII's $300,000 statutory cap and entered judgment in Fischer's favor. UPS then moved for judgment as a matter of law or, in the alternative, a new trial or, as a second alternative, for remittitur. The district court refused to grant judgment as a matter of law on the merits but vacated the punitive damages award as unsupported by evidence of pervasive disregard of anti-discrimination policies by the company. *Fischer v. United Parcel Serv.*, No. 05-70366, 2008 WL 880521 (E.D. Mich. Mar. 31, 2008). It also denied UPS's request for a new trial and refused to remit the compensatory award. The court entered a second amended judgment for Fischer in the amount of $800,000, and UPS brought this timely appeal. Fischer cross-appeals the adverse summary judgment ruling on his internal complaints retaliation claim, as well as the district court's decision to vacate the punitive damages award.

## II. UPS's Appeal

On appeal, UPS attacks the district court's denial of its motion for judgment as a matter of law, for a new trial, or for remittitur. UPS claims that Fischer failed to supply evidence from which a reasonable jury could infer that his firing occurred in retaliation for his prior lawsuit, or that UPS's

proffered legitimate reason for his discharge was pretextual. Alternatively, UPS seeks a new trial

on grounds that the district court abused its discretion in excluding the outcome of Fischer's prior

lawsuit as unfairly prejudicial under Federal Rule of Evidence 403(b). As a second alternative, UPS

argues that the district court erred by failing to remit the compensatory damages award, which UPS

characterizes as excessive.

A.      Motion for Judgment as a Matter of Law

We give fresh review to the denial of a motion for judgment as a matter of law. *Lowery v.

Jefferson County Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009). "Judgment as a matter of law is

appropriate only when there is a complete absence of fact to support the verdict, so that no

reasonable juror could have found for the nonmoving party." *Pouillon v. City of Owosso*, 206 F.3d

711, 719 (6th Cir. 2000) (quotation marks and citation omitted).

A prima facie unlawful retaliation claim under Title VII requires the plaintiff to demonstrate

that (1) he engaged in protected activity; (2) the defendant knew of this exercise of protected rights;

(3) the defendant thereafter took adverse employment action against the plaintiff; and (4) a causal

connection exists between the protected activity and the adverse employment action. *Morris v.

Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Once the plaintiff establishes a

prima facie case, the burden shifts to the defendant "to produce evidence of a legitimate,

nondiscriminatory reason for its actions." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th

Cir. 2008). If the defendant meets its burden, then the plaintiff must demonstrate that the legitimate reason is pretextual. *Id.*

       1.     Causation

UPS argues that Fischer failed to prove any facts from which the jury could infer a causal connection between his prior lawsuit (the protected activity) and his termination (the adverse employment action). Causation exists where the plaintiff "proffer[s] evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516–17 (6th Cir. 2009).

At trial, both sides presented evidence that prior to the first lawsuit Fischer enjoyed a cordial, productive relationship with Jarlett, his direct supervisor, and that the two experienced no difficulty communicating. After he returned to duty, however, Fischer testified that from his first day back on the job, Jarlett's treatment of him differed noticeably. He described his post-return interactions with her as "cold" and "distant," and their communication as deteriorating to "terrible" and "almost nonexistent." Jarlett ignored Fischer's presence in the office, even though she remained cordial with

the other NAMs. Two of Fischer's co-workers corroborated his characterization of Jarlett's changed attitude. And Jarlett singled Fischer out for heightened scrutiny from the first day of his return, when she emailed higher-ups about Fischer's traffic-induced late arrival, precisely tracking his tardiness down to the minute. Jarlett also restricted Fischer exclusively to the office for several months and demanded to know his whereabouts at all times—negative treatment none of the other NAMs under her supervision experienced.

"[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Ziedler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). UPS seizes on the time lapse between Fischer's first lawsuit (filed in October 2000) and his firing (in February 2003), arguing that the delay between the *filing* of the first suit and Fischer's discharge suggests a lack of causation. But this portrayal of the timing skews the practical reality—Fischer had been on medical leave from before his discrimination case came to trial until his February 2002 return. And Fischer presented evidence that Jarlett's retaliatory conduct began on his very first day back on the job and continued unabated until his termination. Thus, as the district court noted in denying UPS's motion for summary judgment, "[t]he alleged retaliatory acts began when the opportunity first presented itself, immediately after he returned to work just two months after the lawsuit concluded." 2007 WL 313565, at *15. And contrary to UPS's claim that Fischer failed to identify any similarly-situated employees who received different treatment, Fischer presented a wealth of evidence that Jarlett treated him differently than all the other NAMs in his

office. Thus, the jury possessed sufficient evidence from which it could infer a causal link between Fischer's first lawsuit and his termination.

2.      Pretext

UPS proffered a legitimate, nondiscriminatory reason for firing Fischer—insubordinate conduct in three meetings Jarlett and local human resources manager Annie VanTilburg held with Fischer during the week of his firing. Thus, the burden swung back to Fischer to prove that this reason amounted to nothing more than a pretext for his firing, which required that he "produce evidence that either the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).

Fischer testified in detail about his behavior at the meetings where he allegedly acted insubordinately. He explained that he responded to the questions asked of him, but when Jarlett and VanTilburg insisted on repeating the same questions over and over, he refused to respond. Fischer's testimony, if credited by the jury, supported a finding that he did not act insubordinately as UPS claimed. Moreover, the facts surrounding the meetings during Fischer's final few days undermine UPS's contention that insubordination motivated his termination. At trial, UPS maintained that a decision on Fischer's firing came only during the second meeting on February 11. But Jarlett had reassigned Fischer's sales accounts the day before, and contacted the company IT department to reset his email and voice mail passwords, suggesting that Fischer's conduct during the next day's meetings

did not affect the termination decision. In addition, the second February 11 meeting lasted only five minutes, a UPS security officer (whose presence was required at all employee firings) attended the meeting, and VanTilburg came prepared with Fischer's termination paperwork in hand. Neither Jarlett nor VanTilburg asked Fischer any questions during the second meeting, undercutting UPS's assertion that Fischer's failure to commit to reforming his behavior led to his termination. And although UPS insists that Fischer's failure to complete training and tests in a timely fashion evidences insubordination, the record shows that UPS routinely excused such failures for other NAMs such that the jury could reasonably conclude that Fischer did not act insubordinately by turning in his assignments late. Fischer's testimony, combined with the factual inconsistencies in UPS's proffered reason for his firing, permitted the jury to infer that UPS concocted the insubordination theory as a pretext for Fischer's termination.

Because Fischer presented evidence sufficient to allow the jury to infer both a causal relationship between his first lawsuit and his termination, and that UPS's proffered reason for firing him was pretextual, we affirm the district court's denial of UPS's motion for judgment as a matter of law on liability.

B.     Motion for a New Trial

Next, UPS challenges the denial of its motion for a new trial, which we review for abuse of discretion, and reverse only if left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir.

2000) (quotation marks and citation omitted). "[A] district court should grant a motion for new trial only when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mitchell v. Boelcke*, 440 F.3d 300, 303 (6th Cir. 2006) (internal quotation marks and citations omitted).

UPS claims entitlement to a new trial on grounds that the district court abused its discretion by refusing to allow the jury to learn the outcome of Fischer's first lawsuit. We find no abuse of discretion in the denial of UPS's motion for a new trial for two principal reasons.

First, UPS cannot show that the underlying evidentiary ruling it challenges—the exclusion of the outcome of Fischer's first lawsuit—amounted to an abuse of discretion by the trial court. Federal Rule of Evidence 403 allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. This court reviews a trial court's evidentiary rulings on admissibility under Rule 403 for abuse of discretion. *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993). In this context, unfair prejudice "refers to evidence which tends to suggest a decision on an improper basis." *Paschal v. Flagstar Bank*, 295 F.3d 565, 579 (6th Cir. 2002) (quotation marks and citation omitted).

The district court found that, although relevant, evidence that Fischer lost his first lawsuit tended to suggest a decision on an improper basis: namely, that because Fischer's first lawsuit ended

adversely to him, this case also lacked merit. UPS fails to identify any flaw in the district court's reasoning. The district court appropriately balanced the probative value of the evidence against the danger of unfair prejudice and acted within its discretion in ordering exclusion. It necessarily follows, therefore, that the district court did not abuse its discretion in refusing to grant UPS's Rule 59 motion where the asserted basis for the new trial—the purportedly erroneous evidentiary ruling—does not merit relief.

Second, even if it could demonstrate an abuse of discretion in the trial court's evidentiary ruling, UPS fails to show the requisite accompanying prejudice. "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998). UPS never articulates how the exclusion of the outcome of Fischer's first lawsuit caused the verdict in this case to be against the weight of the evidence or infected the proceedings with prejudice or bias. We find its theories of how the exclusion of the outcome generated prejudice—by preventing the company (a) from showing that it possessed little motivation to retaliate against Fischer because the UPS won the first suit; (b) from portraying Fischer as a disgruntled employee resentful about the loss; and (c) from impeaching Fischer's testimony about the reasons for his divorce—unconvincing.

That Fischer lost the first suit does not, as UPS insists, necessarily suggest that the company possessed less motivation to retaliate against him. A company required to defend a frivolous

employee lawsuit and then to restore that employee to his prior job seems just as, if not even more, likely to harbor ill will (and potential retaliatory motives) against the complaining employee as a company forced to restore an employee who successfully pursued a meritorious claim. And the fact that Fischer lost the first suit holds little informational value regarding whether or not he was "disgruntled." Other than excluding evidence of the first trial's outcome, the district court placed no restrictions on UPS's efforts to portray Fischer as a disgruntled employee. UPS employed dozens of people who worked with Fischer during the time in question and could have called any of them to testify that Fischer returned to work a malcontent. Under the circumstances, UPS's argument that the exclusion of the first lawsuit's outcome crippled its trial strategy fails to persuade us that the jury rendered a verdict against the weight of the evidence or that bias or prejudice tainted the proceedings.

UPS's contention that excluding the first trial's outcome stymied its efforts to impeach Fischer regarding the reasons for his divorce also lacks merit because the trial court did, in fact, permit UPS to impeach Fischer's testimony on this point. Although not permitted to inform the jury of Fischer's deposition statement that the *loss* of the prior suit factored prominently in his divorce, the court did allow UPS to impeach Fischer with his statement that *the prior litigation* played a leading role in his divorce, and to argue that his decision to pursue that litigation—rather than his termination—led to the divorce. Having presented essentially the same evidence and argument without telling the jury about the outcome of the first case, UPS cannot demonstrate that the damage award would have differed had the jury been informed of the outcome of the first trial. Accordingly, we find no abuse of discretion in the denial of UPS's motion for a new trial.

C.      Motion for Remittur

UPS contends that the district court erred by denying a remittitur because the evidence adduced on compensatory damages cannot sustain the $650,000 award. We review the denial of a motion for remittitur for abuse of discretion and, since Fischer prevailed at trial, view the facts in the light most favorable to him. *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 509 (6th Cir. 2005). A district court properly denies a motion for remittitur unless the jury award "*clearly* exceeds the amount which . . . was the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss." *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 397 (6th Cir. 1997) (quotation marks and citations omitted). To qualify for reduction, the award must be (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience of the court; or (3) the result of a mistake. *Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 278 (6th Cir. 1991).

Focusing on Fischer's admission that he never sought medical treatment, UPS argues that the $650,000 award exceeds the amount a reasonable jury could award as compensation for Fischer's emotional distress. By highlighting the lack of supporting medical evidence, UPS presumably means to suggest that the award exceeded the range supported by proof.[1]

---

[1] UPS's briefing fails to construct this argument around the applicable standard of review. Nowhere does UPS argue that the compensatory award "shocks the conscience of the court" or resulted from mistake, leaving "beyond the range supportable by proof" as the only colorable avenue for relief on this claim. Accordingly, we address it in those terms.

Although a plaintiff need not present medical evidence to receive compensation for emotional distress, "damages for mental and emotional distress will not be presumed, and must be proven by 'competent evidence.'" *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (quoting *Carey v. Piphus*, 435 U.S. 247, 263–64 n.20 (1978)). In denying UPS's remittitur motion, the district court summarized Fischer's trial testimony pertinent to the damage award:

> Plaintiff's termination ended a long career (18 years) and he testified that: 1) his firing was "horrible" and "depressing;" 2) he was unable to find any other employment for one year afterwards; 3) he ultimately found work in different industries which required him to live away from his family during the week; 4) his termination played a large part in his divorce; and 5) the divorce and separation due to his distant jobs strained his relationship with his minor children. Based on his testimony alone, Plaintiff is entitled to recover for "humiliation, embarrassment, disappointment, and other forms of mental anguish resulting from the discrimination."

2008 WL 880521, at *10 (citations omitted).

UPS fails to impugn any of the factual underpinnings the district court gave for refusing to remit the award. Despite its relatively large size, the jury's compensatory damage award does not "clearly exceed[] . . . the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss." *See Roush*, 10 F.3d at 397 (quotation marks and citations omitted). Viewing the evidence most favorably to Fischer, as we must, we find that the district court did not abuse its discretion in refusing to grant remittitur. And although UPS refers us to several similar cases involving markedly lower damage awards, we decline the invitation to disturb the jury's decision. As the district court noted in its opinion, this court has cautioned against attempts by appellate courts

"to reconcile widely varied past awards for analogous injuries 'which in the abbreviated appellate discussion of them seem somewhat similar.'" *Moody v. Pepsi-Cola Metro. Bottling Co.*, 915 F.2d 201, 211 (6th Cir. 1990) (quoting *Precopio v. City of Detroit*, 330 N.W.2d 802, 808 (Mich. 1982)).

### III.  Fischer's Cross-Appeal

Fischer cross-appeals the district court's grant of summary judgment in favor of UPS on his internal-complaints-based retaliation claims, as well as the district court's decision to vacate the jury's punitive damages award.

A.      Fischer's Internal Complaints Claim

Fischer argues that the district court erroneously granted summary judgment in UPS's favor on his Michigan state law claim that UPS retaliated against him for filing two internal complaints shortly before his termination.

We review this claim de novo.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).  Retaliation claims under Michigan's Elliot-Larsen Civil Rights Act differ from Title VII in that they require not just proof of a causal connection between the protected activity and the adverse employment action, but that the protected activity constituted a "significant factor" motivating the adverse action.  *See Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

Other than the temporal proximity between the filing of his internal complaints and his termination, Fischer presented no evidence that his decision to engage in that protected activity prompted UPS to terminate him. Under Michigan's heightened standard, the "[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003). With respect to his internal complaints claim, Fischer failed to present any evidence beyond temporal proximity. Neither Jarlett nor VanTilburg mentioned the internal complaints during the meetings leading to Fischer's termination, and nothing in the record suggests that those complaints specifically motivated their decision. Accordingly, the district court properly granted summary judgment to UPS on this claim.

B.      Punitive Damages

The jury awarded Fischer $1.3 million in punitive damages. The district court initially reduced the award to $300,000 to bring it into compliance with Title VII's statutory cap. Then, on UPS's Rule 50 motion, the court vacated the entire award. Fischer appeals that determination, which we review de novo. *Lowery*, 586 F.3d at 432. We will uphold a grant of judgment as a matter of law "only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Pouillon*, 206 F.3d at 719 (quotation marks and citation omitted). As when reviewing summary judgment, we may "not weigh the evidence, evaluate the credibility of witnesses, or substitute our judgment for that of the jury," *Black v. Zaring Homes, Inc.*,

104 F.3d 822, 825 (6th Cir. 1997), but instead must "look at the evidence in the light most favorable to the nonmoving party and decide if it was sufficient to raise a genuine issue of material fact for the jury," *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 510 (6th Cir. 2001).

Title VII limits recovery of punitive damages to cases where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). *Kolstad v. American Dental Association*, 527 U.S. 526, 539 (1999), establishes a three-part inquiry governing the recovery of punitive damages against an employer. First, the plaintiff must demonstrate that the individuals perpetrating the discrimination acted with malice or reckless disregard toward the plaintiff's federally protected rights. Second, the plaintiff must impute liability to the employer by establishing that the discriminatory actor worked in a managerial capacity and acted within the scope of his or her employment. Third, the defendant may nevertheless avoid punitive damage liability by showing that it engaged in good faith efforts to comply with Title VII. *See Parker v. Gen. Extrusions, Inc.*, 491 F.3d 596, 602–03 (6th Cir. 2007).

Only the third *Kolstad* inquiry—the employer's good faith compliance—remains at issue in this appeal. To determine whether an employer engaged in good faith efforts to comply with Title VII, we focus "both on whether the defendant employer had a written . . . policy and whether the employer effectively publicized and enforced its policy." *Parker*, 491 F.3d at 603. We have previously suggested that "the mere existence of a written anti-discrimination policy alone does not

shield the company from punitive damages." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 532 (6th Cir. 2005). "Rather, the employer must demonstrate that it engaged in good faith efforts to *implement* the policy." *Hall v. Consol. Freightways Corp. of Del.*, 337 F.3d 669, 675 (6th Cir. 2003).

While acknowledging that *Kolstad* does not spell out the type of evidence needed to establish good faith, the district court found that UPS made the requisite showing by "present[ing] ample, undisputed evidence that it formulated, disseminated, and trained employees on its anti-discrimination policies." 2008 WL 880521, at *4. It then concluded that Fischer failed to rebut UPS's evidence of its good faith Title VII compliance efforts, and vacated the punitive damage award. The court endorsed UPS's argument that Fischer "[could not] rely solely upon [UPS]'s failings with regard to him to rebut cognizable evidence" of good faith. *Id.* Based on its reading of *Sackett v. ITC Deltacom, Inc.*, 374 F. Supp. 2d 602 (E.D. Tenn. 2005), it concluded that *Kolstad* required consideration of "the employer's historical approach to such claims." *Id.*

We do not understand *Sackett* or *Kolstad* as requiring such a holding, nor do later Sixth Circuit cases. Indeed, none of this court's cases vacate a jury award of punitive damages or specify the precise showing required to establish good faith as a matter of law. *See West v. Tyson Foods, Inc.*, No. 08-6516, 2010 WL 1507629, at *13–14 (6th Cir. April 15, 2010) (holding that the defendant did *not* establish good faith as a matter of law); *Parker,* 491 F.3d at 604–05 (same); *Tisdale*, 415 F.3d at 533–34 (same); *Hall*, 337 F.3d at 674–76 (same). Consistent with Supreme

Court and Sixth Circuit precedent, we thus inquire only whether—viewing the evidence in the light most favorable to Fischer—a reasonable juror could find in Fischer's favor.

Relying on two cases from other circuits—*Bryant v. Aiken Regional Medical Centers, Inc.*, 333 F.3d 536 (4th Cir. 2003) and *Harsco Corp v. Renner*, 475 F.3d 1179 (10th Cir. 2007)—UPS nevertheless urges us to uphold the district court's judgment because the record evidence of its overall Title VII compliance mechanisms mandates finding good faith as a matter of law. We distinguish both cases because, unlike UPS, the employers in those cases provided evidence from which a jury could conclude effective policy implementation. In *Bryant*, the Fourth Circuit vacated the jury's punitive damage award where it found that the employer not only had an anti-discrimination policy, a grievance policy encouraging employees to bring forward claims of discrimination, and a diversity training program, but also ensured implementation by "voluntarily monitor[ing] departmental demographics as part of an ongoing effort to keep the employee base reflective of the pool of potential employees in the area." 333 F.3d at 548–49. In *Harsco*, the defendant introduced evidence of its comprehensive policies and training procedures and demonstrated effective enforcement by offering undisputed evidence that, after the plaintiff met with the human resources director, management followed policy by launching an investigation of the plaintiff's complaint. 475 F.3d at 1185, 1189.

Here, UPS introduced evidence that it promulgated an anti-retaliation policy, trained its employees on implementing it, and established mechanisms for employees to lodge complaints. But

UPS presented no record evidence from which a reasonable juror would necessarily conclude that UPS effectively advanced its policies. Unlike *Harsco*, where the plaintiff conceded that the company launched an investigation after the plaintiff complained, a reasonable member of Fischer's jury could find that UPS failed to investigate Fischer's complaint. Though VanTilburg claimed that she possessed all of the information she needed to assess the complaint by virtue of her presence at the February 5 meeting, a reasonable juror could have found otherwise—VanTilburg knew nothing about Jarlett's treatment of other employees, and reprimanding only one of the many employees with similar performance issues could support Fischer's retaliation claim. UPS thus failed to demonstrate policy enforcement, distinguishing this case from both *Bryant* and *Harsco*. *See also Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 654 (5th Cir. 2002) (abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)) (affirming decision not to submit punitive damages to the jury where defendant had and publicized an anti-harassment policy and made a good faith effort when it learned of the potential harassment by placing the plaintiff on paid administrative leave while investigating her case, reinstating plaintiff's job duties, and directing the offending manager to take corrective action). On the present record, we cannot conclude that UPS presented evidence of its good faith compliance with Title VII "so overwhelming that reasonable jurors could not conclude otherwise." *See Deffenabugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999).

UPS asserts that, had the district court permitted Jimmy Millard, then the Region Employee Relations Manager, to testify, he would have manifested UPS's good faith. But through Millard,

UPS proposed to supplement testimony about its knowledge of anti-discrimination/retaliation laws and policies and procedures for combating discrimination, the existence of which Fischer did not dispute. We thus find that the district court correctly labeled Millard's testimony as cumulative and, to the extent it differed from evidence already in the record, irrelevant.

Viewing the evidence in the light most favorable to Fischer, the record includes facts that support a punitive damage award. Accordingly, we reverse the district court's judgment and remand with instructions to reinstate the jury's award (subject to the $300,000 statutory cap).

## IV. Conclusion

We affirm the district court's Title VII liability judgment, affirm the summary judgment on Fischer's state law retaliation claim, reverse the judgment vacating the punitive damage award, and remand with instructions to reinstate the award.