RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TOMMY D. SHARP,

*Plaintiff-Appellant,*

*v.*

No. 11-5419

AKER PLANT SERVICES GROUP, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:09-cv-429—Charles R. Simpson, District Judge.

Argued: June 7, 2012

Decided and Filed:  August 9, 2013

Before:  COOK and STRANCH, Circuit Judges; LAWSON, District Judge.*

_____

**COUNSEL**

**ARGUED:** Don C. Meade, PRIDDY, CUTLER, MILLER & MEADE, PLLC, Louisville, Kentucky, for Appellant.  Thomas Matthew Williams, STOLL KEENON OGDEN PLLC, Louisville, Kentucky, for Appellee.  **ON BRIEF:** Don C. Meade, PRIDDY, CUTLER, MILLER & MEADE, PLLC, Louisville, Kentucky, for Appellant. Thomas Matthew Williams, STOLL KEENON OGDEN PLLC, Louisville, Kentucky, for Appellee.

---

*The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

**OPINION**

———————————

LAWSON, District Judge.  Plaintiff Tommy Sharp appeals the district court's order granting summary judgment in favor of his former employer, Aker Plant Services Group, on his age-discrimination claim under the Kentucky Civil Rights Act.  The district court found that there was no evidence that Aker's termination of Sharp was on account of his age.  We respectfully disagree.  In reaching this decision, we address three issues.  First, whether Sharp's supervisor, Mike Hudson, played a determinative role in the layoff decision so as to attribute his motivation to the company; second, whether Hudson's remarks amounted to direct evidence of age discrimination; and third, whether Hudson's expression of age as a factor in his layoff decision was merely a proxy for a legitimate business concern.  We answer yes to the first two issues and no to the third.  Therefore, we must reverse the summary judgment in favor of Aker and remand for further proceedings.

I.

Aker Plant Services Group provides technology products and engineering, procurement, and construction management services for manufacturing companies.  One of Aker's customers, E.I. du Pont de Nemours and Company (DuPont), operates a plant in Louisville, Kentucky, where Aker maintains a team of employees.  At the time relevant to this litigation, Aker's Louisville site team consisted of the site project manager, Mike Hudson; four electrical and instrumentation (E&I) designers — Larry Ash, Bill Kirkpatrick, plaintiff Tommy Sharp, and John Whitaker; three piping designers — Richard Wright, Scott McCafferty, and Gary Stanfield; an estimator/scheduler, Dave Cecil; and a drafter, Christian Claycomb, who was being groomed to become an E&I designer.

Tommy Sharp began working for Aker as a contract employee in 2003.  He was hired as an Aker employee in January 2005 and worked exclusively at the Louisville

plant. In 2008 and 2009, several Aker employees — Carol Brown in 2008 and Sharp, Cecil, Claycomb, Whitaker, and McCafferty in January 2009 — were laid off because Aker's customers canceled or postponed many of their projects. Sharp, who was 52 years old at the time, contends that he was fired because of his age. Sharp's main contention is that his termination is a direct result of Mike Hudson's decision to train Bill Kirkpatrick, and not Sharp, to replace Larry Ash as E&I design lead, and that Hudson based that decision on Sharp's age.

The key piece of evidence for Sharp consists of two conversations with Hudson that occurred in 2009 after Sharp was told he would be laid off. Those conversations are discussed below. But Sharp begins by pointing to evidence that dates to sometime before June 2006, when Hudson allegedly made comments about the advancing age of the design group and the need to bring in younger people. Before that, in 2005, Sharp asked Hudson if Sharp could take on some of the extra work responsibilities performed by Larry Ash, but Hudson declined because "Larry took care of all of that." Then in June 2006, when Bill Kirkpatrick, age 41, was brought to the Louisville site, Hudson directed Ash to train Kirkpatrick to be Ash's backup as part of Hudson's unwritten succession plan. Hudson described his "succession plan" as follows:

> You want somebody that's capable of stepping in and taking over for somebody if they are off sick, if they are on vacation, if they get hurt, or if they retire. So your succession plan may be for three days, three weeks, three months, or whatever.

As a result of Hudson's directive, Ash began training Kirkpatrick in writing function-test procedures and having Kirkpatrick check Ash's work.

Aker insists that its layoff decisions were based on performance, not age, and there is evidence that Hudson and Ash considered Kirkpatrick a superior employee to Sharp. Aker rates its employees on a scale from 1 to 5, 1 representing non-performance, 3 as full performance, and 5 as exceptional performance. Hudson rated Sharp's 2006 overall performance at 3, comprised of the following performance standard ratings: operational and financial results at 3 with a note that Sharp "[n]eeds to continue pushing to complete projects when faced with upcoming deadlines," technical results and quality

of work at 3, job knowledge and skills at 3+, health safety environmental results at 3, people skills at 3, self-management at 3 with a note that Sharp should "[c]ontinue being persistent in gathering information for projects," customer and relationship results at 3, and innovation and improvement results at 3. In 2006, Hudson rated Kirkpatrick an overall 3+, giving him scores equal to or higher than Sharp in every individual performance standard.

In his 2007 evaluation, Sharp's overall performance was rated at 3, and most performance standards were rated at 3 as well. The self-management performance standard contained the only note, and it stated that Hudson "[w]ould like to see Tom take more initiative in getting project information." In 2007, Kirkpatrick's overall performance was rated at 3+, with six of the performance standards being rated at 3+ and two being rated at 3.

Sharp never received his 2008 evaluation, but his scores were noticeably lower. Hudson gave Sharp an overall rating of 2.7. His individual performance standards were rated between 2.5 and 3, with various notes commenting on aspects of his job performance.

Kirkpatrick's 2008 evaluation was consistent with his 2006 and 2007 evaluations. Overall he was rated at 3.2, with individual performance standards scores ranging from 3 to 3.3. The notes were generally positive, and in the leadership category Hudson commented that Kirkpatrick "[h]as started to become a go-to guy for other designs when questions or issues arise." It is unclear whether Kirkpatrick ever received his 2008 evaluation because it is not signed.

Aker suffered a business downturn in October 2008, learning that many of its customers were postponing or cancelling their design projects. Management distributed a "forced rating template" to site team leaders with instructions to rank each employee against his/her peers in various categories. Hudson was asked to rank each of the nine employees at the Louisville site from 1 to 9, with a score of 9 indicating the best employee in that discipline, and a score of 1 indicating the worst. Although Hudson

was out on medical leave from the end of October to the beginning of January, he completed the forced rankings from home in November 2008.

Steve Dellinger, Aker's Mid-America regional manager, received Hudson's forced rankings on December 2, 2008, but sent it back to Hudson, directing him to include John Whitaker in the rankings even though Aker already had decided to terminate Whitaker's position. Hudson ranked the Louisville site team as follows:

| Name (age) | Leadership Skills | Communication Skills | Growth Potential | Adaptability | Critical knowledge | Overall |
|---|---|---|---|---|---|---|
| Ash (55) | 8 | 7 | 2 | 2 | 9 | 5.6 |
| Stanfield (52) | 4 | 1 | 6 | 3 | 5 | 3.8 |
| Kirkpatrick (44) | 9 | 8 | 7 | 9 | 6 | 7.8 |
| McCafferty (58) | 3 | 5 | 3 | 4 | 4 | 3.8 |
| Cecil (37) | 7 | 9 | 8 | 8 | 7 | 7.8 |
| Claycomb (39) | 4 | 6 | 9 | 7 | 1 | 5.4 |
| Wright (55) | 6 | 4 | 1 | 1 | 8 | 4.0 |
| Sharp (52) | 2 | 3 | 5 | 6 | 2 | 3.6 |
| Whitaker (57) | 1 | 2 | 4 | 5 | 3 | 3.0 |

Once Hudson submitted his forced ranking, he was asked to tell upper management which employees Aker should retain and who Aker could release "if forced to reduce headcount." Aker decided that it would keep only two of its four E&I designers. Hudson's forced rankings placed Sharp and Whitaker as the two lowest ranked in that group. Once both the forced rankings and the recommendations were received, Scott Atkins (Aker's senior manager of human resources) and Dellinger reviewed the lay-off recommendations to correlate the recommendations with the forced ranking. It appears that Dellinger and Atkins relied entirely on Hudson's recommendations because neither had any interaction with the Louisville site employees. Thereafter, Dellinger authorized Hudson to begin notifying the employees who were to be fired.

When Hudson informed Sharp of his termination on January 15, 2009, Hudson mentioned that age played a factor in the decision. Sharp described their conversation as follows:

> And then I asked him why Bill [Kirkpatrick] was staying and I was selected to go. And at that point he said that he had been grooming Bill to be Larry's replacement, said that he was younger and that I was in the same age range as Larry and that we would be retiring about the same time and that would leave them needing someone else. And he said Bill was — he said, you want somebody that will give you, you know, ten or so years after the last — the other person leaves. . . . And I said, well you know, I said, Mike, . . . I've got another 15 years to go before I retire. He said, well, we want someone younger. He said Aker has a succession plan where you bring in younger people, train them, so when the older people leave, that you'll have younger people.

During this first conversation, Hudson said that Sharp's performance had never been a problem.

Their conversation prompted Sharp to bring in an audio-recording device the following Monday, January 19, 2009, to secretly record another conversation with Hudson. The parties provided a rough transcript, identifying the participants by first names, which have been changed here to last names for clarity. Sharp began the conversation by asking Hudson for a letter of recommendation. Hudson agreed to write one. After discussing the layoff process and which employees survived it, the conversation turned to the issue of age:

> Sharp: It just concerns me that someone was brought in younger specifically to take Larry [Ash]'s place. Like you said[,] it was unfortunate for John [the other terminated E&I designer] and myself.
>
> Hudson: It is the fact that he is younger.
>
> Sharp: Well[,] yeah, it is the fact that he is younger.
>
> Hudson: Because you, and I and Larry, we're all the same age.
>
> Sharp: Yeah.
>
> Hudson: And you're gonna bring in the guy that's going to give you [sic] additional ten, twelve years or whatever, after, you know, we're gone or if Larry's gone.
>
> Sharp: Yeah.
>
> Hudson: You know because we are, well, I don't know, maybe I shouldn't be using the term age, it's probably not HR, the right way to say it. If I take somebody that is the same age as Larry, like you or John, and train them. Well, we spend a lot of time and effort to train them, and they may turn out to be just as good as Larry, but then you are the same age and you can retire.
>
> Sharp: But I guess that's true for anyone though, I mean . . .

Hudson:     Oh yeah.

Sharp:      Bill could, I mean, hit the lottery and leave anytime too.

Hudson:     Sure, [a]bsolutely!  Yeah.

Sharp:      So I guess I find it a bit unfair, or unfortunate.

Hudson:     Well, you want to find that person that's five or ten years into their career that may have the tools to come along and be the next department head, or lead designer or whatever, and bring them along, that's the idea.  Sometimes it works and sometimes it doesn't.

            . . .

Sharp:      Yeah, [l]ike I said Thursday, you know, it concerned me when you all brought Bill in, in the first place[,] you know, and said[,] you know, this is going to be Larry's replacement. Because I saw a definitely [sic] change in my status when you all did that. I mean cause I was checking Larry's packages, I felt like I was the number two guy, at that point, and[,] you know[,] at some point[,] you know[,] I stopped checking Larry's packages, because Bill was being groomed to do that.

Hudson:     Yeah, and it was a matter of not that your ability all of a sudden became any less.

Sharp:      Right.

Hudson:     [I]t's a matter of his being available, and what I was told was his abilities and everything was [sic] good from what they were telling me at the office . . .

Sharp:      Working towards grooming him.

            . . .

Hudson:     and his age, and where he was in his career, just all everything just aligned right, that he was [sic] a good spot in his career to do that.

Sharp:      Yeah.

Hudson:     And so it worked out well, for that.

Sharp:      Yeah.

Hudson:     [A]nd again[,] it's not that your abilities all of a sudden ceased to exist, or got worse, or anything like that, we just, I hate to keep repeating myself, but we're all of the same age and we're all going to retire and I had an opportunity to bring the next generation in, so that's what we decided to do.  So ah.

Sharp:       Ok, I know you got to go.  If you can get the letter to me, I'll
             start trying to get my resume out.

Hudson:      Sure, sure.  I'll try to make it sound good, but not too gushy.

Sharp:       (laugh) Thanks, Mike.

Hudson:      Hey, Tom.  How many years?  Six?

Sharp:       It'll be six in June.

Hudson explained his comments as an attempt to spare Sharp's feelings by ascribing the layoff decision to succession planning rather than job performance.  However, Hudson and Ash later wrote a letter of recommendation that described Sharp as a "key member of our design group at the Louisville site," attributed his layoff to "recent economic conditions," represented that he "performed all the tasks given him at a high level," certified that he "strives for an error free construction project," and unequivocally "recommend[ed] Tom" as an "E&I Designer."

Sharp was not replaced by another employee; rather, his duties were divided between the remaining E&I designers at the Louisville site.

Sharp filed his complaint in Kentucky state court, alleging that Aker fired him based on age in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. Ann. § 344.040.  Aker removed the case to federal court and filed a motion for summary judgment.  The district court granted Aker's motion because it found that Sharp did not present direct evidence of discrimination and could not show that he was singled out for an impermissible reason.  The court believed that Hudson's comments did not reflect age bias, but rather a concern for maximizing the return on training costs by retaining the employees who would stay with the company longer.  The court also found that Sharp did not satisfy the *prima facie* element of the *McDonnell Douglas* test, and failed to show that the forced ranking was a pretext for age discrimination, particularly in light of evidence that after the reduction in force, the average age of the Louisville team increased from 49.9 to 51.5 years old.

Sharp timely appealed.

## II.

"This court reviews a district court's grant of summary judgment *de novo* and applies the same standard as the district court."  *Alexander v. CareSource*, 576 F.3d 551, 557 (6th Cir. 2009).  When "'reviewing a summary judgment motion, credibility judgments and weighing of

the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. . . . Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'" *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citations omitted) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, we 'draw all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

A.

Under the Kentucky Civil Rights Act, it is unlawful for an employer to "discharge any individual[ ] or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . age forty (40) and over." Ky. Rev. Stat. Ann. § 344.040(1)(a). Age discrimination claims brought under the Kentucky Civil Rights Act "are 'analyzed in the same manner' as ADEA claims." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393-94 (6th Cir. 2008) (quoting *Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 531 & n.3 (6th Cir. 2006); *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984) (explaining that because "[t]he Kentucky age discrimination statute is specially modeled after the Federal law," courts "must consider the way the Federal act has been interpreted")).

The crux of the plaintiff's case necessarily focuses on the conduct of his supervisor, Mike Hudson. The defendant argues that Hudson was not a decision maker because others in the organization ultimately executed the terminations, Hudson was on medical leave at the time, and therefore Hudson's comments cannot be viewed as anything other than stray remarks that have no bearing on Aker's motivation.

An employer may be liable for a supervisor's discriminatory animus if the "supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, --- U.S. ---, 131 S. Ct. 1186, 1194 (2011) (footnote omitted). The employer may escape liability if it conducts an investigation that uncovers justification for the adverse employment action that is "unrelated to the supervisor's original biased action." *Id.* at 1193. However, "the supervisor's biased report may remain a causal factor[, making the

employer liable,] if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Ibid.*; *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012).

The facts in this case, when examined in the light most favorable to Sharp, justify the conclusion that Aker is accountable for whatever age bias Hudson harbored, because Aker terminated Sharp's employment based on Hudson's recommendation. Although Hudson was not the ultimate decision maker, Dellinger and Atkins relied solely on Hudson's forced rankings and recommendation of who Aker could fire without disrupting current projects. That "discriminatory information flow" began with Hudson and influenced the decisions made downstream. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008)). Aker contends that it conducted a multi-step, independent review of the layoff decisions; but that review consisted simply of comparing information submitted by Hudson to other information submitted by Hudson. Aker offers no evidence that it conducted any independent fact gathering. Without considering information from an independent source, Aker's review could not have scrubbed Hudson's alleged age bias from the forced rankings and recommendation.

Aker points to the impact analysis performed by upper management, showing an increase in the average age of the Louisville site team following the layoffs. But that does not assist Aker in avoiding liability at this stage of the case. Although the substance of the impact analysis might be convincing evidence to rebut a disparate impact claim, it does nothing to rebut the fact that Hudson's recommendations served as the basis for the layoff decisions, and that Hudson stated he made his decision based on an illegal factor: age.

B.

Aker argues that even if it is saddled with Hudson's comments, those comments do not constitute direct evidence that age was the but-for factor in the decision to fire Sharp. We cannot agree. "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted). "It does not require the fact finder to draw any inferences to reach that conclusion." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

"In assessing the relevancy of a discriminatory remark, we look first at the identity of the speaker." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination. *Bartlett v. Gates*, 421 F. App'x 485, 489 (6th Cir. 2010); *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). But "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria." *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)). "[T]o prevail on direct evidence at the summary judgment stage, it seems that plaintiffs must prove 'by a preponderance of the evidence . . . that age was the "but-for" cause of the challenged employer decision.'" *Bartlett*, 421 F. App'x at 488-89 (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009)).

Aker contends that Hudson's tape-recorded remarks do not constitute direct evidence of age discrimination because they were stray remarks that were unrelated to the decision-making process. It is true that "general, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008) (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524-25 (6th Cir. 2007) (evidence that supervisor removed employee from account because he was "too old" did not constitute direct evidence of age discrimination because it was not related to his termination), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 n.4 (2009)); *Rowan*, 360 F.3d at 548-49 (employer's nebulous remarks about general need to lower average age of workforce and stray comment that "the older people should go, bring in some new blood," made years before employees' termination, were not direct evidence of unlawful age bias)). However, Hudson's comments were not so vague, general, or ambiguous as to qualify as stray comments. To the contrary, Hudson's remarks were offered to explain the very decision at the heart of this lawsuit. They specifically described Hudson's — and Aker's — rationale in choosing which employees to fire and which to retain. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 755 (6th Cir. 2012) (holding that a supervisor's statement, "I did not want [plaintiff] volunteering for additional military duty when he was needed at UPS," was sufficient direct proof of anti-military animus under Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4311(c)(1)).

Aker also challenges the connection between Hudson's comments and the adverse employment action, making much of the fact that the tape-recorded conversation occurred after the layoff decision and after Sharp had been notified.  Aker's argument ignores the fact that Atkins and Dellinger relied solely on Hudson's input when they decided which employees to let go.  Hudson's comments were a retrospective description of the decision-making process that led to the terminations.  They were both "temporally [and] topically related" to the decision to choose Sharp to lay off.  *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).  If we are to take Hudson at his word, he kept the younger Kirkpatrick and fired the older Sharp because Sharp was "of the same age [as Hudson] and we're all going to retire and I had an opportunity to bring the next generation[] in, so that's what we decided to do."  If there ever was a window into the mind of an employment decision maker, that was it.

### C.

But Aker says that although Hudson mentioned Kirkpatrick's younger age, he did not mean to discriminate unlawfully because of Sharp's age.  Instead, Aker insists that Hudson merely was trying to articulate — inartfully, as it turns out — a legitimate business purpose distinct from age.  The Supreme Court has taught that an aspect of employment that could correspond to age, such as years in service, could be a legitimate basis to distinguish among employees for employment privileges and benefits, say in the area of pensions, as long as the other feature is "analytically distinct" from age.  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993).  To advance its argument, Aker cites one Sixth Circuit case and two cases from other circuits.

The only case binding on this panel, *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243 (6th Cir. 1997), is easily distinguished.  Woythal was a 68-year-old male who worked at Tex-Tenn as its chief engineer, answering only to Tex-Tenn's president.  However, the president also created the job of operations manager, the duties of which included supervising Woythal and his department. Just as Tex-Tenn's business started to expand rapidly, rumors circulated that Woythal was planning to retire.  The president asked Woythal several times about his desire to work for Tex-Tenn and his retirement plans.  And each time Woythal responded that he wanted to continue working until age 70.  But the president found Woythal's answers "evasive," and he thought Woythal was "unwilling to participate in the process of planning . . . growth and expansion." *Id.* at 245.  The operations manager met with Woythal, but it is not clear what transpired because the parties could not agree on the substance of the meeting.  Regardless, the president was

unsatisfied and asked the operations manager to secure a definite commitment from Woythal on his plans. Woythal and the operations manager met again, and the meeting resulted in Woythal believing that he had been fired. The president told Woythal he was sorry that Woythal had decided to leave and told Woythal he could come back to work any time. In an effort to demonstrate that Tex-Tenn's legitimate business reasons — that Woythal resigned when offered the choice between shaping up or shipping out, and he had a negative attitude and lack of interest in the company — were a pretext, Woythal argued that the continued questions about his retirement were an attempt to pressure him into retiring. We found Woythal's argument unavailing, in large part because no one at Tex-Tenn made direct references to Woythal's age. *Id.* at 247. That is a far cry from what occurred in the present case: Hudson informed Sharp he had picked Kirkpatrick because he was younger than Sharp.

The other two cases are not persuasive, either. One involved employer inquiries into the employee's retirement plans, and there was no direct discussion of age. *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (refusing to infer age bias from two retirement inquires, noting that "a company has a legitimate interest in learning its employees' plans for the future"). The other, *Moore v. Eli Lilly & Co.*, 990 F.2d 812 (5th Cir. 1993), was decided just ten days after the Supreme Court decided *Hazen Paper Co. v. Biggins*, makes no mention of the Supreme Court's decision, and runs counter to *Hazen Paper's* holding. The employer in *Moore* told its supervisors not to recommend people over 35 for sales positions. The Fifth Circuit held that making training investments based on age, which could predict long-term employment, was a legitimate business decision. 990 F.2d at 818. But in *Hazen Paper*, the Supreme Court sanctioned employment decisions based on factors that correlate with age only if they are analytically distinct from age. 507 U.S. at 611 (explaining that pension status is distinct from age because an employer under forty may be close to having vested pension rights). Put another way, the proposed age-correlated factor cannot be a proxy for age, else it is unlawful. Hudson's comments, when viewed in the light most favorable to Sharp, boil down to one theme: Aker picked Kirkpatrick because he is younger. Aker's asserted business concern — potential longevity with the company — is nothing more than a proxy for age.

When the district court agreed with Aker, it relied heavily on *Lee v. Rheem Manufacturing Co.*, 432 F.3d 849 (8th Cir. 2005), to hold that Hudson's comments "reflected legitimate business concerns about the plaintiff's expected years of service rather than discriminatory animus." *Sharp v. Aker Plant Servs. Grp., Inc.*, No. 09-429, 2011 WL 864952,

at *4 (W.D. Ky. Mar. 11, 2011).  But once again, the case is readily distinguished, and it does not, we believe, support the district court's ruling.  In *Lee*, the plaintiff worked for Rheem as its human resource manager for twenty-three years until he was diagnosed with chronic fatigue syndrome and voluntarily retired in 1995 or early 1996.  Then in 2002, Rheem advertised an open position in the human resources department; the position's listed requirements were commensurate with Lee's previous employment with Rheem.  Lee, 63 years old at the time, applied but was not selected.  Instead, Rheem hired a 39-year-old.  Lee believed he had direct evidence of age bias, because his interviewers told him that

> "things have changed a lot," asked Lee if he thought he would be able to "grasp these new processes" in the plant, and stated that Rheem had to "plan for the future."  [One interviewer] made the analogy of Lee returning to a basketball team during a new season with a new coach and finding himself on the bench. In addition, both [interviewers] asked Lee how long he intended to work if hired.

*Lee*, 432 F.3d at 853.  The court reasoned that although Lee's expected years of work was related to his age, his expected longevity merely correlated with age and did not implicate "the prohibited stereotype."  *Ibid.*

Unlike the present case, the comments in *Lee* only obliquely referenced the plaintiff's age.  An inquiry about how long an employee intends to work if hired has been held to reflect a legitimate employer concern that is analytically distinct from age.  Of course, *Lee* is not binding precedent in this circuit, and to the extent that *Lee* holds that longevity and age can be confounded, as the district court seems to have read it, the case appears to have stretched the Supreme Court's reasoning in *Hazen Paper* beyond its logical limits.  In holding that an employer could make employment decisions based on pension status, the *Hazen Paper* Court relied on the fact that an employee's pension status was analytically distinct from his age.  As the Court explained:

> On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer.  Yet an employee's age is analytically distinct from his years of service.  An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA . . . may have worked for a particular employer his entire career, while an older worker may have been newly hired.  Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

*Hazen Paper Co.*, 507 U.S. at 611. *Lee*, however, seems to suggest that age-based comments by a decision maker can be ignored if those comments also invoke a concern about an employee's expected longevity with the company. That is not what *Hazen Paper* held.

In contrast, Hudson's remarks in this case, taken in the light most favorable to the plaintiff, disclose no analytical step between computing an employee's potential longevity with the company and his age. Instead, Hudson stated in essence that Aker's succession plan was to hire or retain younger workers at the expense of older workers because it was more likely that the former would stay with the company longer than the latter. That reasoning suggests no analytical path that strays from an age-based rationale. It certainly cannot be said to be "analytically distinct" from age. Sharp therefore has offered evidence that Hudson used potential longevity with the company as a proxy for age.

Aker also argues that Sharp acknowledged, and Hudson agreed, that Hudson's comments could apply to anyone because a younger individual could leave at any time. Assuming that is true, potential longevity is no measuring stick at all. It simply becomes another way to "artfully" say: "We've chosen the younger candidate because, well, he is younger." That constitutes direct evidence that age was the reason for terminating Sharp, and summary judgment in favor of Aker should not have been granted.

D.

Aker also argues that it would have made the same decision to discharge Sharp absent an impermissible motive because Sharp was an inferior performer compared to Kirkpatrick. Perhaps, but the jury should decide that question. Although Aker has offered evidence that supports its argument, a genuine issue of material fact exists as to whether Sharp was an inferior employee. For instance, Aker argues that Sharp submitted nothing more than his subjective view of his own qualifications. That misstates the record. Sharp offered two critical pieces of evidence: Hudson's and Ash's letter of recommendation and the transcript of Hudson's conversation.

Hudson's and Ash's letter of recommendation states that Sharp "performed all the tasks given him at a high level," "ha[d] shown his ability to communicate with our client and his peers," and was "aware of details and [strove] for an error free construction project." Although not a glowing recommendation, it is enough to establish that Sharp was a competent worker.

But the most important piece of evidence on this point, once again, is the transcript of Hudson's conversation with Sharp. When discussing why Aker chose to fire Sharp and not Kirkpatrick, Hudson stated:

> [I]t's not that your abilities all of a sudden ceased to exist, or got worse, or anything like that, we just, I hate to keep repeating myself, but we're all of the same age and we're all going to retire and I had an opportunity to bring the next generation[] in, so that's what we decided to do.

Although Hudson asserted that he framed his comments that way to avoid discussing Sharp's inferior performance to spare Sharp's feelings, at the summary judgment stage the Court is prohibited from making credibility judgments and weighing the evidence. *Biegas*, 573 F.3d at 374.

Aker also relies on Sharp's performance evaluations to establish his inferior capabilities. However, those performance evaluations were completed by Hudson, and the value of his opinion is undermined by his comments ascribing his decision to Sharp's age. *Grano v. Dep't of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983) ("Courts have frequently noted that subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination.").

### III.

We conclude that Sharp has offered direct evidence that, if believed by the jury, proves that age was the reason Aker fired him. Certainly there are other explanations, but the true reason for termination is a question that cannot be answered as a matter of law. Therefore, summary judgment for the defendant is **REVERSED**, and the case is **REMANDED** for further proceedings.