**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0040n.06

Case No. 14-5415

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jan 13, 2015
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TOMMY D. SHARP, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| AKER PLANT SERVICES GROUP, INC., | ) | KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: GIBBONS and COOK, Circuit Judges; GWIN, District Judge.[*]

COOK, Circuit Judge. In this employment action, Plaintiff-Appellant Tommy D. Sharp sued his former employer, Defendant-Appellee Aker Plant Services Group, Inc., for refusing to rehire him in retaliation for Sharp's pending age-discrimination lawsuit. Aker countered that its decision to reject Sharp's application stemmed from his violation of workplace policies during a previous stint at Aker. The district court granted summary judgment to Aker, finding that Sharp failed to establish a causal connection between his age-discrimination lawsuit and Aker's decision not to rehire him. Sharp appeals the judgment, and we REVERSE.

---

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

Aker provides engineering, procurement, and construction services to a number of clients engaged in manufacturing, including E.I. du Pont de Nemours and Company ("DuPont"). In 2003, Sharp began working on a contract basis for Aker's team at the DuPont chemical manufacturing plant in Louisville. Two years later, Aker hired him as a full-time electrical and instrumentation designer.

In January 2009, Sharp was let go in a workforce reduction brought on by the 2008 recession. When Sharp's supervisor, Mike Hudson, delivered the bad news, Sharp asked why the company selected him rather than his less experienced, less senior co-workers. Hudson replied that he, Sharp, and Sharp's team leader would all retire at approximately the same time, and that the company could ensure continuity in team operations by retaining Sharp's younger co-worker and grooming him to become the next team leader. Four days later—roughly two weeks before his effective termination date—Sharp returned to work with two digital MP3 music players and secretly recorded a second conversation in which Hudson reiterated his reasons for terminating Sharp rather than the younger co-worker. *See Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 795–96 (6th Cir. 2013) (publishing the transcript of Sharp's recording).

In March 2009, Sharp sent Aker a demand letter along with copies of the recorded conversation. Aker refused the demand, but demoted supervisor Hudson several months later for using "wrong words" in his recorded conversation with Sharp. (R. 25-2, Ex. A, Hudson Dep. at 8–13.) Sharp sued for age discrimination, and the lawsuit culminated in an August 2014 jury verdict for Aker. Afterward, the district court denied Sharp's motion for a new trial. The present action concerns events that occurred while Sharp's age-discrimination suit pended.

In July 2010, a staffing agency sought to place Sharp with Aker in a temporary position as an electrical designer at DuPont's Louisville plant. Scott Atkins, Aker's Senior Manager of Human Resources, received the staffing agency's inquiry on the next day and rejected Sharp's candidacy by email, offering the following explanation:

> Yes, we do know Tom. He does acceptable work as a designer, but he violated a DuPont mandate on the use of electronic recording devices on company property when last employed here. There are combustible materials in the plant that can potentially be ignited by the use of cell phones, recorders, cameras, etc… [sic] DuPont maintains a zero-tolerance approach to safety violations on its property so, unfortunately, we will not be able to consider Mr. Sharp for this role.

(R. 25-13, Ex. L, Atkins Email.)

Atkins's email refers to alleged violations of DuPont's Site Policies Brochure and Safety Manual. The Site Policies Brochure prohibits "CAMERAS/RECORDING DEVICES" on plant premises. (R. 25-12, Ex. K, Site Policies Brochure.) The Safety Manual states that "knowingly violating safety rules and procedures" constitutes a terminable offense, and prohibits "[u]sing or divulging . . . any confidential information such as trade secrets" as well as "[b]ringing radios, cameras, TV's, electrical or battery operated devices . . . on the Plant without permission of Management." (R. 25-11, Ex. J, Safety Manual at 2–3.) The Safety Manual further explains: "Electrical or battery operated equipment (i.e. pagers, cell phones, etc.) must be intrinsically safe from providing an ignition source and must be managed to the same degree as other spark producing equipment or materials." (*Id.* at 3.)

Sharp filed a complaint with the Equal Employment Opportunity Commission, complaining that Aker refused to consider his application in retaliation for the ongoing age-discrimination lawsuit. After receiving a right-to-sue letter from the EEOC, Sharp filed his complaint against Aker, alleging retaliation in violation of the Age Discrimination in

- 3 -

Employment Act, 29 U.S.C. §§ 621, *et seq.*, and the Kentucky Civil Rights Act, Ky. Rev. Stat. Ann. §§ 344.040, *et seq.* After the close of discovery, Aker moved for, and the district court granted, summary judgment on both claims. Sharp appeals the judgment.

II.

We review the district court's grant of summary judgment de novo. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). We construe all reasonable inferences in favor of Sharp, the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and uphold the grant of summary judgment if "there is no genuine dispute as to any material fact and [Aker] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).

III.

We analyze both Sharp's state and federal retaliation claims using the burden-shifting framework erected in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393–94 (6th Cir. 2008); *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999). Absent direct evidence that Aker refused to rehire Sharp in retaliation for his age-discrimination lawsuit, Sharp must establish a *prima facie* case by showing: (1) he engaged in a protected activity; (2) Aker knew Sharp engaged in this activity; (3) Aker thereafter took an employment action adverse to Sharp; and (4) a causal connection exists between Sharp's protected activity and Aker's adverse employment action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

If the plaintiff traces out a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. *Id.* The plaintiff then bears the burden of demonstrating that the defendant's legitimate reason was a pretext for

retaliation. *Id.* Importantly, only the burden of production shifts between parties; the plaintiff bears the burden of persuasion at all times. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256–58 (1981).

A.     *Causal Connection*

The district court concluded its inquiry at the first step of the *McDonnell Douglas* framework, finding that Sharp failed to establish the necessary causal connection between his age-discrimination suit and Aker's rejection of his application. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516–17 (6th Cir. 2009). "The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

1.     *District Court's Rationale*

The district court found that Sharp could not establish causation because he introduced neither temporal-proximity evidence nor evidence that Aker treated Sharp's similarly situated co-workers more favorably. The court concluded, as a matter of law, that the fifteen-month lapse between Sharp's demand letter—when Aker first learned of Sharp's intent to pursue redress for

age-discrimination—and Aker's decision to reject his application for rehire precluded a finding of temporal proximity. The court then determined that none of the co-workers that Sharp identified as comparators were similarly situated because "none of them [had] filed an age discrimination claim against Aker." (R. 56, Summ. J. Order at 7.)

The district court erred. As an initial matter, the court assessed Sharp's ability to show temporal proximity and to produce comparators as discrete inquiries. The court needed instead to consider those two factors in light of one another—together with Sharp's other circumstantial evidence—to determine whether "an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen*, 229 F.3d at 563 ("[N]o one factor is dispositive in establishing a causal connection . . . ."); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (holding that a plaintiff must adduce supporting evidence of causation in inverse proportion to the temporal proximity between his protected activity and the adverse action).

Second, the district court erred in rejecting Sharp's evidence of temporal proximity on the sole ground that more than six months elapsed between his letter and Aker's refusal. To be sure, this court requires a very brief interval between protected activity and adverse action before it permits a plaintiff to demonstrate causation solely on the basis of temporal proximity. *See Mickey*, 516 F.3d at 524–25. But our precedent expressly rejects the district court's position that a span of more than six months between protected activity and adverse action categorically precludes finding causation. *Dixon*, 481 F.3d at 335; *see also Harrison v. Metro. Gov't of Nashville & Davidson Cnty.*, 80 F.3d 1107, 1118–19 (6th Cir. 1996) (holding that the evidence supported a *prima facie* case of causation where the alleged retaliation occurred one year and three months after the protected activity), *overruled on other grounds as recognized by Jackson*

*v. Quanex Corp.*, 191 F.3d 647, 667 n.6 (6th Cir. 1999). The need to look past a six-month interval "is especially true in the context of a *reinstatement* case, in which the time lapse between the protected activity and the denial of reinstatement is likely to be lengthier than in a typical employment-discrimination case." *Dixon*, 481 F.3d at 335.

Finally, the court erred in rejecting Sharp's proposed comparators on the ground that none previously filed age-discrimination suits against Aker. A plaintiff need only "demonstrate that he or she is similarly situated to the claimed comparator in all relevant respects. In the disciplinary context, . . . the plaintiff and her proposed comparator must have engaged in acts of comparable seriousness." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916–17 (6th Cir. 2013) (internal citations and punctuation omitted). The filing of an age-discrimination suit matters not in ascertaining whether other employees engaged in comparable misconduct. The district court thus unreasonably circumscribed Sharp's ability to produce a comparator.

### 2. Alternative Grounds for Affirming

Aker abandons any defense of the district court's reasoning. Instead, it argues that, even properly analyzing the facts and circumstances here, Sharp cannot demonstrate a causal connection. *See Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters v. Airborne, Inc.*, 332 F.3d 983, 986 n.3 (6th Cir. 2003) ("It is well-established that a prevailing party may assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court." (citation and internal quotation marks omitted)). We disagree.

Considering the evidence in the light most favorable to Sharp, one could reasonably infer that Aker declined to rehire Sharp in retaliation for his then-pending discrimination action. Yes, it was fifteen months later. But because Aker terminated Sharp months before he disclosed his

intent to sue, no opportunity for retaliation manifested until the staffing agency tried placing Sharp back at DuPont's Louisville plant. Aker rejected Sharp on the same day it received his application. And Atkins, the Aker employee who fielded the proposal that Sharp fill Aker's vacancy at the DuPont plant, became personally involved in the underlying lawsuit just two months before rejecting him. This combination of circumstances means that the fifteen-month interval between letter and rejection could be consistent with a retaliatory motive.

In addition, Sharp offers evidence that his co-worker, Gary Stanfield, brought a smart phone to the plant daily between 2008 and Sharp's rejection. (Sharp's Br. at 27–28; R. 25-4, Ex. C, Stanfield Dep. at 25–26, 29–31; R. 29-3, Ex. B, Sharp Dep. at 87, 90.) The record supports Sharp's contention that Stanfield's phone came equipped with video recording equipment and that Stanfield used the phone to take pictures while at the plant. (R. 29-3, Sharp Dep. at 99–102, Ex. 12.) Despite Hudson's deposition statements that such conduct violated worksite policies, Aker never disciplined Stanfield. (*See* R. 25-2, Hudson Dep. at 40–44; R. 25-4, Stanfield Dep. at 28–30.) A jury could reasonably find, therefore, that Stanfield brought a multi-purpose, handheld electronic device to the plant and used it as a camera or recording device. These facts similarly situate Stanfield and Sharp in all aspects relevant to Aker's stated reason for rejecting Sharp's application: "the use of electronic recording devices on company property." Given Sharp's low burden of production at this first stage of the inquiry, *see Dixon*, 481 F.3d at 333, the evidence concerning Stanfield and the chronology of events establishes a *prima facie* case of retaliation.

Aker objects to this reasoning on several grounds, none availing. Citing *Plumb v. Potter*, 212 F. App'x 472 (6th Cir. 2007), Aker first contends that Sixth Circuit precedent dooms Sharp's argument that evidence of swift retaliation by an employer once the opportunity arises can

counterbalance a lengthy interval between the protected activity and the adverse action. But *Plumb* neither binds us nor persuades us that Sharp's opportunity-based argument is defective as a matter of law. In *Plumb*, the plaintiff claimed that his employer denied him a promotion in retaliation for an EEOC complaint that he filed eight years previous. Plumb argued that his employer had no opportunity to retaliate until he applied for a promotion. *Id.* at 482. The court rejected this argument, noting the fact that Plumb's employer had other opportunities to retaliate during the eight-year interval between Plumb's EEOC complaint and his promotion request. *Id.* at 482–83.

In contrast, Aker terminated Sharp before he filed his age-discrimination lawsuit, and therefore could not retaliate against him in any manner until he returned seeking temporary employment a year and a half later. Evidence showing that an employer had no opportunity to retaliate sooner supports a finding of temporal proximity. *See Fischer v. United Parcel Serv., Inc.*, 390 F. App'x 465, 469 (6th Cir. 2010) (finding that the plaintiff could establish causation after two-and-a-half-year interval based on the "practical reality" that he took an extensive period of medical leave during that time); *Dixon*, 481 F.3d at 335 (holding similarly in the context of a reinstatement case).

Aker also challenges Sharp's use of Stanfield as a comparator in several ways. First, it argues that Sharp cannot analogize Stanfield's smart-phone use to the use of MP3 players because the devices implicate different worksite policies. Aker notes that while DuPont's Site Policies Brochure prohibits cameras and recording devices on plant premises, it permits cell phone use in certain locations and under certain conditions. But when Atkins listed both as examples of prohibited safety hazards in his email to Sharp's staffing agency, he never distinguished the policies governing these two devices. And Sharp presents evidence that

DuPont considered MP3 players and other digital music players "radios" and permitted their use on plant premises to the same extent as cell phones. (*See* R. 25-4, Stanfield Dep. at 32–34; R. 29-3, Sharp Dep. at 89–90.)

Second, there remains a genuine dispute of fact over Aker's assertion that DuPont distinguishes between audio and video recording devices in its effort to protect trade secrets. DuPont's use of a slash to connect "recording devices" with "cameras" in its written prohibition suggests no distinction. And Aker's own evidence conflicts on whether the prohibition against recording devices applies equally to smart phones and MP3 players. (*Compare* R. 25-2, Hudson Dep. at 40–44, R. 25-13, Atkins Email, *and* R. 25-6, Ex. E, Taylor Dep. at 22–31, *with* R. 25-4, Stanfield Dep. at 28–30, 57–58.)

Aker next argues that only job applicants, as opposed to regular employees like Stanfield, were similarly situated to Sharp. In many cases a plaintiff's status as an applicant, probationary employee, or regular employee might distinguish him from a putative comparator, but not here. Aker maintains that it rejected Sharp's application as a direct result of actions he took at DuPont's plant as an Aker *employee*. Because the record supports Sharp's claim that Aker never disciplined other employees *in any fashion* for violating DuPont's worksite policy, a jury could reasonably infer that Aker enforced it against Sharp on account of the pending lawsuit. *See Martinez*, 703 F.3d at 917; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Finally, Aker contends that Sharp cannot point to evidence in the record that Atkins also knew of Stanfield or other employees violating DuPont's worksite policies. In support Aker cites *Wallace v. Methodist Hospital System*, where the Fifth Circuit rejected several of the plaintiff's proposed comparators because "no one in a supervisory capacity was aware of the [proposed comparators'] actions." 271 F.3d 212, 221 (5th Cir. 2001). Unlike *Wallace*, however,

the record in this case includes evidence that Hudson, Aker's highest ranking supervisor at the DuPont plant, knew of Stanfield's smart-phone use. (*See* R. 25-4, Stanfield Dep. at 25–31.) And Sharp offers evidence that Hudson instructed Atkins on the scope of DuPont's worksite policies. (R. 25-2, Hudson Dep. at 26; R. 25-3, Atkins Aff. ¶¶ 4–5.) In sum, none of Aker's objections persuades us that, as a matter of law, Sharp cannot establish a *prima facie* causal connection.

B. *Non-Retaliatory Justification and Pretext*

In the alternative, Aker invites us to exercise our discretion and affirm the district court's judgment on the ground that Sharp cannot produce evidence that Aker's proffered non-discriminatory reason for refusing to rehire him was pretextual. Although the district court never analyzed Sharp's retaliation claim under the later steps of the *McDonnell Douglas* framework, we see little purpose in remanding these issues given the de novo standard of review and the fact that both parties fully developed the arguments presented on appeal in their summary judgment briefs. *See Bennett v. Spear*, 520 U.S. 154, 166–67 (1997); *Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999).

Because the evidence allows a reasonable juror to infer "that the adverse action would not have been taken had [Sharp] not filed a discrimination action," Aker must produce evidence that it refused to rehire Sharp for a legitimate, non-retaliatory reason. *Nguyen*, 229 F.3d at 563. Aker asserts that Sharp's use of MP3 players on plant premises without prior authorization violated DuPont's worksite policies and that it could not rehire him because DuPont has "zero tolerance" for known violators, barring them from its property. Aker meets its burden of production with documentary evidence that DuPont prohibits cameras and recording devices on plant premises and that termination may result for first-time violators of DuPont safety and security policies.

That brings us to pretext. "[O]nce the employer has come forward with a nondiscriminatory reason for [the adverse action], we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (citation omitted), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). In order to do this, Sharp must produce evidence that Aker's justification: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009).

Sharp directs his arguments primarily toward the third method of rebuttal, which, "ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not [disciplined] even though they engaged in substantially identical conduct to that which the employer contends motivated its [adverse action]." *Manzer*, 29 F.3d at 1084. Rebuttal of this sort constitutes a "direct attack[] on the credibility of the employer's proffered motivation for [the adverse action] and, if shown, provide[s] an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Id.* (internal citations omitted).

Sharp argues that using MP3 players in the office areas of the plant did not warrant Aker's refusal to rehire him because Aker did not consider similar conduct by other employees to violate DuPont's worksite policies. Sharp directs us to evidence that Stanfield and Hudson used their smart phones to take pictures in the DuPont plant offices and that other Aker employees routinely brought similar electronic handheld devices onto plant premises. (R. 25-4, Stanfield Dep. at 25–34; R. 29-3, Sharp Dep. at 87–90, 99–102, Ex. 12.) Although this conduct appears to violate DuPont's ban and raise the same safety concerns about igniting chemicals cited in Atkins's email, Aker never disciplined Stanfield, Hudson, or the other employees. Thus,

Sharp "has put forth evidence that the conduct for which he was [not rehired] was common and accepted practice before and after his termination." *See Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 334–35 (6th Cir. 2012) (concluding that the plaintiff met his burden with evidence that his supervisor engaged in the same conduct that ostensibly led to his termination).

Aker produces no admissible evidence that DuPont actually viewed Sharp's use of MP3 players as a violation of its worksite policies. Aker relies entirely on hearsay statements attributed to DuPont's Louisville site manager by Hudson. (*See* R. 25-2, Hudson Dep. at 27–32.) And, in fact, Sharp did work at a different DuPont plant in Tennessee after Aker rejected his application. Sharp also presents evidence that at some point, DuPont abandoned a similar written prohibition on radios and headphones, undermining Aker's argument for a strict interpretation of written policies.

Aker counters that Atkins rejected Sharp's application because he honestly believed that the use of MP3 players constituted a violation of DuPont's worksite policies sufficient to bar Sharp from re-entering the plant. Under our precedent, "as long as an employer has an honest belief in its proffered nondiscriminatory reason . . . , the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001); *see also Allen*, 545 F.3d at 398 (applying the "honestly held belief" rule to an employer's policy interpretation). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "When the employee is able to produce sufficient evidence to [the contrary], thereby making [the employer's] decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.* at 807–08.

Sharp points to several parts of the record that undermine the legitimacy of Aker's justification and raise a question of fact as to whether it made a reasonably informed and considered decision to reject his application. As an initial matter, Atkins rejected Sharp's application in less than a day, despite his avowed unfamiliarity with the worksite policies at DuPont's Louisville plant. In fact, Atkins relied on Hudson's assessment that Sharp's use of MP3 players violated DuPont worksite policies. (R. 25-3, Atkins Aff. at ¶¶ 4–5; R. 25-2, Hudson Dep. at 26.) Yet Atkins's email to the staffing agency characterizes Sharp's use of MP3 players purely as a safety violation, which contradicts Hudson, and other Aker witnesses, who testified at depositions that Sharp's use of the MP3 players posed no safety hazard. (R. 25-2, Hudson Dep. at 51; R. 25-4, Stanfield Dep. at 60; R. 25-6, Taylor Dep. at 19–20, 25.) Only after responding to the staffing agency's inquiry did Atkins profess his understanding that MP3 players threatened DuPont's interest in protecting trade secrets. (*Compare* R. 25-13, Atkins Email, *with* R. 25-3, Atkins Aff. ¶ 5.) Aker's witnesses give conflicting views on the scope of DuPont's prohibition against "CAMERA/RECORDING DEVICES." (*Compare* R. 25-2, Hudson Dep. at 38–43, *and* R. 25-13, Atkins Email, *with* R. 25-6, Taylor Dep. at 29–30, R. 25-4, Stanfield Dep. at 45–46, 58–59, *and* R. 25-10, Ex. I, Kirkpatrick Dep. at 21–22.) Hudson, on whom Atkins appears to have relied, interpreted the policy differently from DuPont's site engineering manager. (*Compare* R. 25-2, Hudson Dep. at 39–43, *with* R. 25-6, Taylor Dep. at 29–30.)

Furthermore, the fact that Hudson waited several days after learning of Sharp's recording—and the accompanying lawsuit based on Hudson's "wrong words"—before informing Atkins that these actions violated worksite policies could support the inference that Hudson fabricated or embellished the violation in an attempt to ease his own circumstances at

Aker.  (*See* R. 25-2, Hudson Dep. at 24–26.)  Thus, the evidence raises a dispute of fact as to whether Atkins acted reasonably in relying on Hudson's account to reject Sharp's application, and—more generally—whether Aker honestly believed that Sharp's use of MP3 players barred him from future employment at the DuPont plant.

IV.

Unconvinced by any of Aker's alternative grounds to support summary judgment, we REVERSE and REMAND this case for trial.